Thomas R. GALLIGAN, Petitioner,

v.

INDIANA DEPARTMENT OF STATE
REVENUE, Respondent.

No. 49T10–9907–TA–172.

Tax Court of Indiana.

March 30, 2005.

Steven D. Groth, Ronald M. Soskin, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Petitioner.

Steve Carter, Attorney General of Indiana, Linda I. Villegas, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

Thomas R. Galligan (Galligan) appeals the final determination of the Indiana Department of State Revenue (Department) which assessed him with the unpaid sales and use tax liabilities of Irish Park, Inc. (IP) for the 1993, 1994, and 1995 tax years (years at issue). The case is before the Court on the following issues:

I. Whether collecting IP's tax liabilities from Galligan for the years at issue violates his right to due process; and

II. Whether the Department has erred in imposing sales and/or use tax on certain IP transactions?

## FACTS AND PROCEDURAL HISTORY

IP was an excavating and construction company located in Jeffersonville, Indiana. Galligan founded the company in 1983 and served as its president and director from 1983 until January of 1996. Galligan resigned from those positions in January of 1996, after he was elected mayor of Jeffersonville.

In August of 1996, the Department audited IP and determined that it had been deficient in collecting and remitting Indiana sales and use tax during the years at issue. Consequently, in October of 1996, the Department issued proposed assessments to IP in the amount of $16,415.06, plus penalties and interest. IP did not protest the assessments. In January of 1997, the Department issued demand notices to IP for payment. In May of 1997, IP, struggling financially, was liquidated. IP's tax liabilities, however, were still outstanding.

In October of 1997, the Department attempted to collect IP's unpaid tax liabilities from Galligan pursuant to Indiana Code § 6–2.5–9–3. This statute, known as the "responsible officer statute," provided that "[a]n individual who[ ] is an . . . officer . . . of a corporate or partnership retail merchant [ ] and [ ] has a duty to remit state gross retail or use taxes . . . to the [D]epartment [ ] holds those taxes in trust for the state *and is personally liable for the payment of those taxes, plus any penalties and interest attributable to those*

*taxes*, to the state." IND.CODE ANN. § 6–2.5–9–3 (West 1997) (emphasis added).

Galligan subsequently protested the assessment. The Department conducted a telephone hearing on the matter. On January 19, 1999, the Department issued a Letter of Findings (LOF) denying Galligan's protest.[1]

On July 16, 1999, Galligan initiated an original tax appeal. The Court conducted a trial on December 20, 2000, and heard the parties' oral arguments on August 16, 2001. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ The Court reviews final determinations of the Department *de novo*. IND. CODE ANN. § 6–8.1–5–1(h) (West 2005). Consequently, the Court is bound by neither the evidence nor the issues presented at the administrative level. *Snyder v. Indiana Dep't of State Revenue*, 723 N.E.2d 487, 488 (Ind. Tax Ct.2000), *review denied*.

### Discussion

#### I. Due Process

■ "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections[.]" *Ball v. Indiana Dep't of State Revenue*, 563 N.E.2d 522, 524 (Ind.1990) (quoting *Mullane v. Central Hanover Bank*, 339 U.S. 306, 314–15, 70

---

1. It appears from the record that the issue of responsible officer liability was the only issue discussed during the Department's hearing. (*See* Resp't Ex. 2; Trial Tr. at 24, 83.) It was only after Galligan initiated his original tax appeal that he presented his objections to the actual audit findings.

S.Ct. 652, 94 L.Ed. 865 (1950)). Galligan asserts that he was deprived of due process in that he was not given proper notice of the assessment against IP and thus did not have the opportunity to protest such assessment. More specifically, Galligan explains that when the assessment was imposed against IP in October of 1996, and, subsequently, when he personally received notice of that assessment in October of 1997, he was no longer an officer of IP. Consequently, he "had no ability to gain access to [IP] documents nor to adequately respond to the proposed assessment." (Pet'r Br. at 5.)

## A. The 1993 Liability

At the outset, this Court reverses the portion of the Department's final determination holding Galligan liable for IP's 1993 tax deficiency. Indeed, because the 1993 assessment claim against Galligan was untimely, the Court need not even address the issue of an alleged due process violation. *See Harlan Sprague Dawley, Inc. v. Indiana Dep't of State Revenue,* 605 N.E.2d 1222, 1231–32 (Ind. Tax Ct.1992) (noting that the Court has a duty not to enter upon consideration of a constitutional question where it can perceive another ground on which to rest its decision).

When the Department made its assessment against Galligan, Indiana Code § 6–8.1–5–1 provided that "[i]f the [D]epartment reasonably believes that a person has not reported the proper amount of tax due, the [D]epartment shall make a proposed assessment of the amount of the unpaid tax[.]" IND.CODE ANN. § 6–8.1–5–1(a) (West 1997). Nevertheless, "the [D]epartment may not issue a proposed assessment

... more than (3) three years after the latest of the date the return is filed, or ... the due date of the return; or [ ] in the case of a return filed for the state gross retail or use tax ... the end of the calendar year which contains the taxable period for which the return is filed." IND.CODE ANN. § 6–8.1–5–2(a) (West 1997) (amended 2002).

 When the Department provides a corporation with timely notice of a tax assessment, personal notice to the responsible officer then in charge is not required. *Ball,* 563 N.E.2d at 524. Indeed, "it may be safely assumed that [those responsible officers] are aware of [the responsible officer statute] which is the source of their potential personal liability and that they are aware of and privy to corporate correspondence relating to their corporate duties including notices of assessment sent to the corporation." *Id.* In this case, however, when the Department issued its October 1996 notice to IP, Galligan was no longer with IP, let alone the responsible officer in charge. Therefore, the Court will not presume that when IP received assessment notices from the Department in October of 1996 for the 1993 tax year, Galligan was aware of that assessment. Consequently, in order for the Department to issue an assessment against Galligan personally for any outstanding 1993 liability, it was required to do so by January of 1997. *See* A.I.C. § 6–8.1–5–2(a); IND.CODE ANN. § 6–2.5–6–1 (West 1997) (amended 2002) (stating that sales/use tax returns for a particular month are due no later than 20 to 30 days after the end of that month).[2]

 The evidence indicates that Galligan did not receive personal notice that he

2. In other words, IP's sales/use tax return for 1993 was due no later than the end of January, 1994. *See* IND.CODE ANN. § 6–2.5–6–1 (West 1997) (amended 2002). In turn, the Department had three years from that point,

or until January of 1997, to issue an assessment against Galligan for that liability. *See* IND.CODE ANN. § 6–8.1–5–2(a) (West 1997) (amended 2002); IND.CODE ANN. § 6–2.5–6–1 (West 1997) (amended 2002).

was being assessed with IP's 1993 tax liability until October of 1997. Thus, the Department failed to give Galligan timely notice of the assessment. The Court therefore REVERSES the portion of the Department's final determination holding Galligan personally liable for IP's outstanding 1993 sales and use tax liability.[3]

### B. The 1994 and 1995 Liabilities

■ The Court now turns its analysis to whether Galligan can be held personally liable for IP's 1994 and 1995 tax liabilities. For the 1994 and 1995 tax years, the Department timely issued personal assessment notices to Galligan within the three-year statute of limitations. See A.I.C. § 6–8.1–5–2(a). Therefore, Galligan received adequate notice "to apprise [him] of the pendency of the action [against him]." See Ball, 563 N.E.2d at 524 (citing Mullane, 339 U.S. at 314–15, 70 S.Ct. 652).

■ Galligan claims that the Department's collection efforts must, nevertheless, fail because any opportunity he had to present his objection to the assessment was meaningless. (Pet'r Reply Br. at 2.) More specifically, Galligan explains that "[i]n between [his] resignation as an officer and his receipt of notice regarding the

assessment, the audit had been conducted, an assessment had been made against [IP], and [IP] had been liquidated through a distressed sale." (Pet'r Reply Br. at 3.) "These events virtually guaranteed that in 1998, after he finally did receive notice, [he] would be unable to locate and produce the documents that would verify his position on the challenged items." (Pet'r Reply Br. at 2.) While this is an unfortunate series of events, the Court finds that they do not alter the legal outcome of the case.

■ It is undisputed that, during the years at issue, Galligan was the president of IP. Pursuant to statute, he can be held personally liable for the taxes *incurred during those years* if he had the duty, at that time, to remit the taxes to the State. See A.I.C. § 6–2.5–9–3. See also Hunt v. Indiana Dep't of State Revenue, 790 N.E.2d 630, 632 (Ind. Tax Ct.2003). Given his position as president of IP, the presumption is that Galligan had the duty to remit the taxes incurred during the years at issue. See Indiana Dep't of State Revenue v. Safayan, 654 N.E.2d 270, 273 (Ind. 1995). This presumption has not been rebutted.[4]

---

**3.** Had Galligan remained an officer of IP, however, the result would have been different. Indeed, the Department's collection efforts would not have been untimely, as the statute of limitations would have tolled with respect to Galligan when IP received its assessment notices. See Hunt v. Indiana Dep't of State Revenue, 790 N.E.2d 630, 633 n. 4 (Ind. Tax Ct.2003).

**4.** Galligan attempts to rebut this presumption by claiming that from 1994 (when he began his Jeffersonville mayoral campaign) through 1995 (at which time he was elected mayor), and ending in January of 1996 (when he formally resigned as president of IP), his involvement in IP's business was "minimal." (Trial Tr. at 18.) In other words, Galligan claims that he basically resigned in late 1994,

leaving several others in charge because he was not there very often. (See Trial Tr. at 19.)

The Department is not required, however, to prove that Galligan was the only responsible person. Indiana Dep't of State Revenue v. Safayan, 654 N.E.2d 270, 274 (Ind.1995). Indeed, "[a] party may be liable for trust taxes without having exclusive control over the corporation's funds." Id. (citation omitted). While Galligan claims he did not exercise his position of authority during the years at issue, he did not officially relinquish his position as the president of IP until January 1996 and therefore possessed the requisite authority to pay the taxes. See id. at 274 (citing Van Orman v. State, 416 N.E.2d 1301, 1304 (Ind. Ct.App.1981)). See also Ball v. Indiana Dep't of State Revenue, 563 N.E.2d 522, 525 (Ind. 1990).

■ As a result, it does not matter that Galligan received personal notice of the assessment when he was no longer a responsible officer of IP. Indeed, as a responsible officer from 1993 to 1996, Galligan was put on notice, via Indiana Code § 6–2.5–9–3, of his personal liability for any taxes incurred and due during those years. *See Ball,* 563 N.E.2d at 524. Galligan was subsequently afforded an opportunity to contest his liability as a responsible officer in a hearing before the Department. He was given another opportunity to contest his liability as a responsible officer, as well as an opportunity to present his objections to the actual assessment itself, at his trial before this Court. Thus, Galligan was afforded all the due process that was required.[5] *See Ball,* 563 N.E.2d at 524 (quoting *Mullane,* 339 U.S. at 314–15, 70 S.Ct. 652) (footnote added).

## II. Specific Audit Challenges

In the course of auditing IP, the Department determined that IP owed sales and/or use tax on various retail transactions during 1994 and 1995 and issued proposed assessments thereon. Galligan now challenges several of those findings.[6]

### A. Assessment of Sales Tax on Delivery Charges

■ Indiana imposes an excise tax, known as the state sales tax, on retail transactions made within the state. IND. CODE. ANN. § 6–2.5–2–1 (West 2005). During 1994 and 1995, a taxable retail transaction was defined as "a transaction of a retail merchant that constitutes selling at retail as is described in IC 6–2.5–4–1 . . . or that is described in any other section of IC 6–2.5–4." IND.CODE ANN. § 6–2.5–1–2(a) (West 1994). In turn, "selling at retail" was defined as follows:

> A person is engaged in selling at retail when, in the ordinary course of his regularly conducted trade or business, he:
>
> (1) acquires tangible personal property for the purpose of resale; and
>
> (2) transfers that property to another person for consideration.

IND.CODE ANN. § 6–2.5–4–1(b)(1),(2) (West 1994) (amended 2003). Thus, because selling at retail requires the transfer of tangi-

---

5. Galligan's claim that he was prejudiced by his inability to access IP documents warrants no special legal consequence. Indeed, the issue is not really whether his inability to access IP documents deprived him of due process, but whether he adequately protected his interests before he resigned and later, in preparation for litigation.

First, as already noted, it is presumed that Galligan, before he resigned from IP in 1996, was aware of his personal liability for any potential deficiencies incurred during those years. *See Ball,* 563 N.E.2d at 524. Consequently, Galligan should have insured that all IP documents and records were in order before he left. Second, it appears that during the litigation process Galligan simply used "polite" efforts to access IP documents: "I can't get records. I've asked people to go look at—they tell me they'll try. Someone told me the records are gone. I don't have any records, so I really cannot [challenge the proposed assessment]." (Trial Tr. at 35, 106.)

Efforts with more muscle, however, were required. IP was under a statutory duty to keep its records pertaining to any taxes due during 1994 and 1995 for at least three years "after the date the final payment of the particular tax liability was due[.]" *See* IND.CODE ANN. § 6–8.1–5–4 (West 1994 & 1995). Consequently, when IP stonewalled Galligan, he could have—and should have—utilized the arsenal of discovery tools available under Indiana Trial Rules 26 through 37 to either gain access to the documents or to procure a sworn statement that the records had indeed been destroyed.

6. Both Galligan and the Department have indicated that their dispute as to the taxability of some of the transactions has been resolved. (*See* Pet'r Br. at 8; Resp't Br. at 6.) The Court therefore instructs the Department, on remand, to remove these transactions from the audit report.

ble personal property, the sale of services generally falls outside the scope of taxation because no transfer of tangible personal property occurs. *Howland v. Indiana Dep't of State Revenue*, 790 N.E.2d 627, 628 (Ind. Tax Ct.2003).

 In its audit report, the Department assessed sales tax on approximately 15 different transactions in which it believed IP sold dirt, sand, and rock to its customers, but failed to collect sales tax thereon (i.e., at the time of sale). To support its assessment, the Department cites to the 15 IP invoices which merely state "1 ton sand;" "145 loads of dirt;" "4 loads topsoil." (*See* Resp't Ex. 1 at 5, 8–10.) In addition, the Department's auditor testified at trial that the way the invoices read led him to believe that IP was selling sand, dirt, and topsoil. (*See* Trial Tr. at 95.)

At trial, however, Galligan testified that IP did not sell such items to its customers, but merely delivered them. More specifically, Galligan explained that during the years at issue, IP was in the business of digging sewer lines, water lines, streets and roads. (Trial Tr. at 17.) As part of that process, it was necessary for IP to dispose of the dirt that it had excavated. (Trial Tr. at 27.) The dirt was available to anyone for the taking. (Trial Tr. at 27.) IP never purchased the dirt for resale. (Trial Tr. at 29.) In those instances where someone wanted the dirt but was unable to transport it, IP would haul the dirt for them to the desired location. (*See* Trial Tr. at 28–29.) IP would charge these customers a hauling fee per load, but there was never a charge for the dirt. (Trial Tr. at 29.) Consequently, Galligan claims that the subject transactions do not constitute

selling at retail, but rather a service, and are therefore not taxable.[7]

 As the Department correctly asserts, Galligan bears the burden of proving the proposed assessment is wrong. *See Clifft v. Indiana Dep't of State Revenue*, 748 N.E.2d 449, 452 (Ind. Tax Ct.2001). Here, the Department claims that Galligan failed to meet his burden. Indeed,

> [Galligan] claimed in conclusory fashion that [the transactions at issue] represented hauling of the tangible personal property and no sale occurred. There is nothing to corroborate [Galligan's] testimony. Therefore, [having] submitted no documentation to verify that the transaction was not the sale of tangible personal property, the auditor correctly assessed sales tax.

(Resp't Br. at 7 (internal citation omitted).) The Court disagrees.

 When a taxpayer claims he is not within the ambit of taxation, he must present a prima facie case in order to meet his burden of proof. *Longmire v. Indiana Dep't of State Revenue*, 638 N.E.2d 894, 898 (Ind. Tax Ct.1994). A prima facie case is one in which the evidence is " 'sufficient to establish a given fact and which if not contradicted will remain sufficient.' " *Id.* (internal citation omitted). In this case, Galligan's testimony at trial constituted direct and reasonable evidence that the subject transactions did not involve a retail sale of tangible personal property. Indeed, Galligan, as IP's president, possessed first-hand knowledge as to what the nature of IP's business was as well as how it conducted that business. *See Indiana Sugars, Inc. v. State Bd. of Tax Comm'rs*, 683 N.E.2d 1383, 1387 (Ind. Tax Ct.1997) (holding that the sworn testimony of a witness who had personal knowledge of

---

7. In his written brief, Galligan claims that 12 of the 15 transactions are non-taxable. (Pet'r Br. at 7–8.) The Court notes that in his reply brief, however, Galligan states that all 15 transactions are non-taxable. (*See* Pet'r Reply Br. at 10.)

corporate procedures regarding the mailing of documents and who stated that he personally placed a return in the mail on or before the due date constituted sufficient evidence to prove timely mailing).

Once the taxpayer has presented a prima facie case, the duty to go forward with that evidence may shift several times. *Longmire*, 638 N.E.2d at 898 (citation omitted). Thus, it was incumbent on the Department to rebut Galligan's prima facie case. Instead, the Department merely argues that more evidence was required from Galligan.[8] This does not constitute a rebuttal.

The Court finds that on the basis of the evidence presented, the subject transactions are not retail sales subject to taxation. The Department's audit report, as it relates to this issue, is therefore REVERSED. Accordingly, on remand, the Department is instructed to remove these transactions from its audit report.[9]

### B. Assessment of Use Tax on Hauling Charges

Galligan's next challenge focuses on the Department's imposition of use tax on delivery charges IP paid on certain purchases of stone. While the audit report does not explain the basis for the Department's assessment, the Department's written brief indicates that it relied on Indiana Administrative Code title 45, rule 2.2–4–3, in making the assessment. (*Cf.* Resp't Ex. 1 *with* Resp't Br. at 7.) That regulation provides:

(a) Separately stated delivery charges are considered part of selling at retail and subject to sales and use tax if the delivery is made by or on behalf of the seller of property not owned by the buyer.

(b) [To that end, t]he following guidelines have been developed:

(1) Delivery charge separately stated with F.O.B. destination[10]—taxable.

(2) Delivery charge separately stated with F.O.B. origin—non[-]taxable.

(3) Delivery charge separately stated where no F.O.B. has been established—non[-]taxable.

(4) Delivery charges included in the purchase price are taxable.

---

8. In the Indiana and United States legal systems, witnesses are sworn to tell the truth. Criminal defendants are often sentenced to prison based on little more than the sworn testimony of a witness. Here, however, the Department is not willing to accept Galligan's sworn testimony as direct and reasonable evidence as to the nature of IP's business and how it transacted that business. In essence, the Department has apparently adopted the position that taxpayers such as Galligan will simply lie under oath in order to avoid paying taxes. (*See* Oral Argument Tr. at 30–31.) The Court is not so jaded.

9. In its written brief filed with the Court, the Department makes an alternative argument to support the taxability of the subject transactions: "even if [IP] did secure [the dirt, etc.] without cost, when [it] disposes of this property [it] is accountable ... for the [sales] tax, unless the ultimate recipient could have purchased it exempt." (Resp't Br. at 7 (relying

on Ind. Admin. Code tit. 45, r. 2.2–4–22 (1992)).) The Department misses the point. The regulation to which it refers addresses "[p]rocedure when a tax is not paid on construction material *when purchased by a contractor.*" 45 IAC 2.2–4–22 (emphasis added). The evidence in this case reveals that IP never purchased the dirt in the first place.

10. "F.O.B." (i.e., free on board) is "[a] mercantile-contract term allocating the rights and duties of the buyer and the seller of goods with respect to delivery, payment, and risk of loss[.]" Black's Law Dictionary 690 (8th ed.2004). Generally, it stands for the proposition that "the seller's delivery is complete (and the risk of loss passes to the buyer) when the goods pass the transporter's rail[; t]he buyer is responsible for all costs of carriage." *Id.* An "F.O.B. destination" denotes "that the seller is required to pay the freight charges as far as the buyer's named destination." *Id.* at 691.

IND. ADMIN. CODE tit. 45, r. 2.2–4–3 (1992) (footnote added).

Neither party disputes the fact that the subject delivery charges were separately stated on the invoices listed in the audit report. (*See* Trial Tr. at 59.) (*See also* Resp't Br. at 7.) Rather, the parties dispute the delivery terms of the stone. Galligan, on the one hand, provided detailed testimony at trial that the stone in the subject transactions was delivered to IP by common carriers that were hired by the quarries themselves, that the stone was delivered to IP F.O.B. origin and, because the title to the stone passed upon transfer of the material from the quarries to the common carriers, if the common carrier had an accident and lost the stone, the common carrier was required to reimburse IP for the stone. (Trial Tr. at 59–60.) The Department, on the other hand, claims that because there is nothing "[o]ther than [Galligan's] own self-serving testimony" to corroborate the fact that the delivery terms were F.O.B. origin, the assessments must therefore stand. (Resp't Br. at 8.)

As stated earlier, Galligan, as IP's president, is personally knowledgeable as to how IP conducted its business. Accordingly, Galligan's testimony that IP received its shipments of stone F.O.B. origin constitutes reasonable evidence that such was the case. The Department failed to rebut this evidence.[11] Accordingly, the Department's audit report finding that these transactions are taxable is REVERSED. The Department is instructed, on remand, to remove these transactions from its audit report.

### C. Credit for Sales Tax Paid in Other States

The next issue before the Court involves those transactions in which the Department assessed IP with use tax on purchases it made in Kentucky and on which IP paid Kentucky sales tax. Galligan argues that, pursuant to Indiana Code § 6–2.5–3–5, IP is entitled to a credit against the Indiana use tax in the amount of the sales tax it paid to Kentucky. The Department argues, on the other hand, that Kentucky erroneously collected sales tax from IP and, as a result, it (the Department) will not give a credit for those taxes previously paid.

Indiana imposes a use tax on goods purchased outside of the state and brought into the state for use. *See Rhoade v. Indiana Dep't of State Revenue*, 774 N.E.2d 1044, 1047 (Ind. Tax Ct.2002). The imposition of this tax is based on two general theories: (1) that Indiana merchants will lose business if taxpayers purchase goods out-of-state to avoid sales tax liability and (2) that the state will lose tax revenue if taxpayers purchase goods out-of-state. *See id.* Consequently, Indiana's use tax is functionally equivalent to its sales tax and is "imposed on the storage, use, or consumption of tangible personal property in Indiana if the property was acquired in a retail transaction, regardless of the location of that transaction or of the retail merchant making that transaction." IND.CODE ANN. § 6–2.5–3–2(a) (West 1994).[12] Nevertheless, "[a] person is enti-

---

11. Rather, the Department attempts to convince the Court that taxability is the "default" under Indiana Administrative Code title 45, rule 2.2–4–3. (*See* Resp't Br. at 7.) Indeed, the Department asserts that unless and until the taxpayer provides documentation stating separate delivery charges with an F.O.B. origin, the delivery charges will always be taxable. (*See* Resp't Br. at 7–8.) This assertion, however, ignores the provision of the regulation that states that in instances where an invoice indicates a separate delivery charge but no F.O.B., the transaction is non-taxable. *See* IND. ADMIN. CODE tit. 45, r. 2.2–4–3(b)(3) (1992).

12. In other words, Indiana's use tax complements Indiana's sales tax to ensure that nonexempt retail transactions (particularly out-of-

tled to a credit against the use tax imposed on the use, storage, or consumption of a particular item of tangible personal property equal to the amount, if any, of sales tax, purchase tax, or use tax paid to another state, territory, or possession of the United States for the acquisition of that property." IND.CODE ANN. § 6–2.5–3–5(a) (West 1994) (amended 2004).[13]

▆▆▆ The words of a statute are given their plain, ordinary, and usual meaning unless the legislative intent reveals a contrary purpose. *Williams v. Indiana Dep't of State Revenue,* 742 N.E.2d 562, 564 (Ind. Tax Ct.2001) (internal citation omitted). Here, IP paid Kentucky sales tax on various items it purchased from Kentucky vendors. (*See* Resp't Ex. 1 at 11, 14–15, 17, 18–20.) (*See also* Trial Tr. at 102 (Department's auditor admitting that Kentucky sales tax had been paid).) The plain language of Indiana Code § 6–2.5–3–5(a) provides that IP is entitled to a credit against its Indiana use tax liability in the amount of sales tax paid to Kentucky. *See* A.I.C. § 6–2.5–3–5(a).

Despite this unambiguous language, the Department argues that the credit provided for in Indiana Code § 6–2.5–3–5(a) does not apply to the subject transactions because they "consisted of tangible property delivered to [IP] in Indiana from Kentucky." (Resp't Br. at 8.) Instead, the Department argues that the credit applies only in those situations where a taxpayer

has purchased property in another state and personally brings it back to Indiana. (*See* Resp't Br. at 8.) To support its claim, the Department refers to two of its own administrative regulations. First, it cites to Indiana Administrative Code title 45, rule 2.2–3–20, which states

> All purchases of tangible personal property which are delivered to the purchaser for storage, use, or consumption in the state of Indiana are subject to the use tax. The use tax must be collected by the seller if he is a retail merchant described in [ ] 45 IAC 2.2–3–19[ ] or if he has Departmental permission to collect the tax. If the seller is not required to collect the tax . . . the purchaser must remit the use tax directly to the Indiana Department of Revenue.

IND. ADMIN. CODE tit. 45, r. 2.2–3–20 (1992). The second regulation the Department cites to is Indiana Administrative Code title 45, rule 2.2–3–16, which provides that "[l]iability for Indiana use tax shall be reduced by a credit for the amount of any sale, purchase, or use tax paid to any other state, territory or possession of the United States with respect to the tangible personal property on which Indiana use tax applies." IND. ADMIN. CODE tit. 45, r. 2.2–3–16 (1992). Based on the terms of these regulations, the Department asserts that IP's only remedy "is to file for a refund of the Kentucky tax taken in error." (Resp't Br. at 8.)[14] The Department is incorrect.

state retail transactions) that escape sales tax liability are nevertheless taxed. *See USAir, Inc. v. Indiana Dep't of State Revenue,* 623 N.E.2d 466, 468–69 (Ind. Tax Ct.1993).

**13.** This credit is intended to prevent multiple taxation of interstate commerce, which is prohibited by the Commerce Clause of the United States Constitution. *See Simon Aviation, Inc. v. Indiana Dep't of State Revenue,* 805 N.E.2d 920, 927–28 (Ind. Tax Ct.2004).

**14.** The Department takes a *very* cursory approach in explaining its position on this issue. (*See* Resp't Br. at 8.) The Court therefore interprets the gist of its argument as this: because the Kentucky vendors knew that IP intended to use, store, or consume the property it purchased from them in Indiana (by the fact that they were delivering the property to IP in Indiana), it should have been clear to them that Indiana had the right to charge use tax on the subject transactions, and therefore

The Department may issue rules and regulations to implement a statute, and those rules and regulations have the force of law. *C & C Oil Co. v. Indiana Dep't of State Revenue,* 570 N.E.2d 1376, 1381 (Ind. Tax Ct.1991) (internal citation omitted). The Department cannot, however, enlarge or vary by its rules and regulations the power conferred on it by the legislature or create a rule out of harmony with the statute. *Id.* (internal citation omitted). Indiana Code § 6–2.5–3–5(a) makes no mention that the credit against Indiana use tax is only applicable to situations in which a taxpayer has purchased property in another state and personally brings it back to Indiana. To the extent that the restriction is contained in the Department's administrative regulations, the restriction is inharmonious with the plain and ordinary meaning of Indiana Code § 6–2.5–3–5(a). The Department's audit report with respect to the taxability of these subject transactions is therefore REVERSED.[15] The Department is instructed, on remand, to remove these transactions from its audit report.

### D. Assessment of Use Tax on Charges for Services

The Court now turns to the Department's assessment of use tax on various charges IP paid for services such as the machining and repair of its equipment, asphalt paving, material testing, and the construction of concrete curbs. Galligan asserts the assessments are in error because "services are not taxable." (*See* Pet'r Br. at 16.) The Department, however, asserts that because IP's service-providers transferred tangible personal property to IP in the course of providing their services, the transactions, in their entirety (i.e., both the materials and the service), are taxable as retail unitary transactions.[16] (*See* Resp't Br. at 8–9 (footnote added).)

As mentioned earlier, the provision of services is, generally, not taxable. As a practical matter, however, "mixed transactions" often occur where tangible personal property is sold in order to complete a service contract, or where services are provided in order to complete the sale of tangible personal property. For these mixed transactions, distinguishing the taxable sale of property from the non-taxable sale of services is often difficult. Accordingly, the legislature has set forth several parameters for imposing tax on these transactions. First, taxable property does not escape taxation merely because it is transferred in conjunction with the provi-

the Kentucky vendors were not entitled to collect Kentucky sales tax from IP.

**15.** "An exemption from or credit for Indiana's use tax will depend on the amount of sales or use tax already paid to another state by an Indiana taxpayer." *Rhoade v. Indiana Dep't of State Revenue,* 774 N.E.2d 1044, 1051 n. 5 (Ind. Tax Ct.2002). "The payment of another state's sales or use tax, however, will not necessarily exempt an Indiana taxpayer from the entire amount of Indiana use tax or entitle the taxpayer to a use tax credit equal to the out-of-state sales or use tax already paid." *Id.*

**16.** The Court has had to "fill in the blanks" with respect to the Department's position on this issue. Indeed, the Department's whole argument is the assertion that "Galligan failed to meet the requirements of 45 IAC 2.2–4–2"; nevertheless, the Department failed to develop any independent argument to support its assertion. (*See* Resp't Br. at 9.) Given the fact that this Court is not in the business of making a party's argument for it, as well as the fact that this Court has previously questioned the validity of regulation 45 IAC 2.2–4–2, the Court will not address the applicability of the regulation to the instant case. *See Meyer Waste Sys., Inc. v. Indiana Dep't of State Revenue,* 741 N.E.2d 1, 11 n. 12 (Ind. Tax Ct.2000), *review denied; Cowden & Sons Trucking, Inc. v. Indiana Dep't of State Revenue,* 575 N.E.2d 718, 725 n. 7 (Ind. Tax Ct.1991).

sion of non-taxable services. Ind.Code Ann. § 6–2.5–4–1(c)(2) (West 1994) (amended 2004). Second, services, generally outside the scope of taxation, are subject to tax to the extent the income represents "any bona fide charges which are made for preparation, fabrication, alteration, modification, finishing, completion, delivery, or other service performed in respect to the property transferred *before its transfer and which are separately stated on the transferor's records.*" A.I.C. § 6–2.5–4–1(e)(2) (emphasis added). Finally, the legislature imposes tax on services that are provided in a retail unitary transaction, "a unitary transaction that is also a retail transaction." Ind.Code Ann. § 6–2.5–1–2(b) (West 1994). A unitary transaction is one which "includes all items of personal property and services which are furnished under a single order or agreement and for which a total combined charge or price is calculated." Ind.Code Ann. § 6–2.5–1–1(a) (West 1994).

### 1. Clark County Metals

■ Galligan testified at trial that IP hired Clark County Metals to perform various machining services on IP's own equipment. (Trial Tr. at 46.) Galligan admits that, on occasion, Clark County Metals provided (i.e., sold) parts, such as pins or screws, in connection with its services. (Trial Tr. at 48.) The invoices from Clark County Metals to IP indicate that IP was charged one undivided price per sales contract: a total which included the combined costs of the material, the sales tax on the materials, and the cost of the machining services. (*See* Pet'r Exs. D, E, and F.)

■ Such charges clearly constitute retail unitary transactions. *See* A.I.C. § 6–2.5–1–1(a). As this Court has previously explained, however, services rendered in retail unitary transactions are taxable only if the transfer of the property and the rendition of services are inextrica-

ble and indivisible. *See Howland,* 790 N.E.2d at 629 (citation omitted). Generally, the transfer of property and the rendition of services are inextricable and indivisible when the services are performed before the property was transferred to the transferee. *See* A.I.C. § 6–2.5–4–1(e) (providing that a retail unitary transaction is taxable to the extent that income from the transaction represents (1) the price of the property transferred and (2) any bona fide charges which are made for preparation, fabrication, alteration, modification, finishing, completion, delivery, or other service performed in respect to the property transferred *before its transfer* (emphasis added)). Services provided after a transfer of property, however, indicate a divisible transaction in which the sale is taxed but the services are not.

Here, Clark County Metal's machining services are provided concurrently with the transfer of parts to IP; therefore the temporal relationship of the two events does not indicate whether the transaction is inextricable and indivisible. Consequently, the Court must look to other factors to determine whether the transaction is inextricable and indivisible, such as the service-provider's records, the overall nature of its business, as well as the nature of the unitary transactions themselves. *See Cowden & Sons Trucking, Inc. v. Indiana Dep't of State Revenue,* 575 N.E.2d 718, 723 (Ind. Tax Ct.1991). Based on the only evidence presented at trial (i.e., the invoices from Clark County Metals to IP), this Court cannot find that Clark County Metals intended to treat the transfer of property and the provision of its services separately. Consequently, the Department's assessment of use tax against these transactions is AFFIRMED.

### 2. Ewing Machine

■ At trial, Galligan testified that Ewing Machine charged IP $70.00 for a

service similar to that of Clark County Metals. (*See* Trial Tr. at 49–50.) The Department notes in its audit report that the invoice ·from· Ewing Machine to IP indicated that, in fabricating two pins, Ewing Machine "only taxed material." (Resp't Ex. 1 at 12.)

While the subject invoice has not been presented as evidence, it is clear from the auditor's comment that some type of delineation was made on the invoice to indicate what materials were sold and the applicable sales tax charged thereon. Obviously, then, the invoice from Ewing Machine indicated its intent to treat the sale of its services and the sale of materials separately. Consequently, the Department's assessment of use tax against the service component of this transaction is REVERSED.

### 3. B & G Enterprises

■ IP hired B & G Enterprises to provide asphalt paving services. (Trial Tr. at 44–45.) In the course of providing those services, B & G also provided the "cold patch" paving materials. (Trial Tr. at 44–45.) At trial, Galligan submitted seven invoices from B & G Enterprises to IP that simply listed the amount of cold patch purchased by IP and the amount of sales tax B & G charged thereon; the invoices do not provide a charge for, nor mention, the service component of the transaction. (Pet'r Ex. B.) Consequently, it is clear that, with respect to these seven invoices, B & G Enterprises treated the sale of its services and the sale of the cold patch materials in a very divisible manner. The Department's assessment of use tax against the service component of these transactions is therefore in error.[17]

### 4. J.K.G. Testing and Supply, Inc.

■ The Department also assessed use tax against IP for a $622.78 charge from J.K.G. Testing and Supply, Inc. (Resp't Ex. 1 at 13.) Galligan testified at trial that this charge was for deflection and air testing; there was no transfer of materials whatsoever. (Trial Tr. at 55.) Galligan's testimony is corroborated by the invoice from J.K.G. (*See* Pet'r Ex. K.) Because the transaction is pure service, it is not subject to taxation. Accordingly, the Department's assessment of tax against this transaction is REVERSED.

### 5. Eberle Enterprises, Inc.

■ Eberle Enterprises, Inc. constructs concrete curbs. (Trial Tr. at ·65–66.) Galligan testified at trial that IP hired Eberle to slip form some curbs on a project. (Trial Tr. at 65–66.) As part of that process, Eberle furnished flumes and plastic. (Trial Tr. at 66.) The flumes were used to carry concrete down into the ditches, and the plastic was used to protect the concrete curbs from rain and freezing. (Trial Tr. at 66.)

As stated earlier, when the transfer of property and the rendition of services are concurrent, the Court must look to other factors to determine whether the transaction is inextricable and indivisible, such as the service-provider's records, the overall nature of its business, as well as the nature of the unitary transactions themselves. *See Cowden,* 575 N.E.2d at 723. Based on the only evidence presented at trial (i.e., Galligan's testimony), this Court finds that the overall nature of Eberle's business was to provide a service, and the

---

**17.** The Court notes, however, that the Department's audit report lists another five invoices from B & G to IP, totaling $5,233.60. (Resp't Ex. 1 at 11.) Because these invoices were not submitted as evidence, it is impossible for the Court to determine whether the sale of services was divisible from the sale of materials. The Court must therefore uphold the imposition of use tax against those five invoices.

use of flumes and plastic in providing that service was incidental. (*See* Trial Tr. at 66.) Such a finding supports the divisibility of the transactions at issue. *Cf. Cowden*, 575 N.E.2d at 723. Consequently, the Department's assessment of use tax against these transactions is REVERSED.

' 6. Eastern Electroplate, Inc.

 Finally, the Department assessed use tax on a $1,922 charge IP paid to Eastern Electroplate, Inc. (*See* Resp't Ex. 1 at 20.) Galligan testified at trial that the charge was for repair services performed on IP's caterpillar excavator. (Trial Tr. at 70.) Galligan further testified that the repair included the rechroming of a shaft and the repacking of a shaft, as well as the incidental furnishing of a rod piston. (Trial Tr. at 70–71.) (Resp't Ex. 1 at 20.) Just like the transaction with Eberle, the evidence in the record as to this transaction supports a finding that Eastern Electroplate's rendition of a service and the provision of material were divisible. *Cf. Cowden*, 575 N.E.2d at 723. Consequently, the Department's assessment of use tax against these transactions is REVERSED.

### E. Tax–Exempt Purchases

 Galligan's next challenge focuses on certain purchases made by IP on which the Department has assessed use tax. Galligan claims that those purchases are exempt from tax because the property purchased "became a permanent part of the improvements on jobs performed for tax-exempt organizations."[18] (Pet'r Br. at 18 (footnote added).) *See also* IND.CODE ANN. § 6–2.5–5–16 (West 1994) (amended 1996) (stating that acquisitions of tangible personal property by a state or local government are exempt from sales tax if the property is predominantly used in the performance of a governmental function). Given the evidence in the record, however, the Court must AFFIRM the Department's imposition of tax.

Indiana Administrative Code title 45, rule 2.2–3–12 states that

(a) Tangible personal property purchased to become a part of an improvement to real estate under a contract with an organization entitled to exemption is eligible for exemption when purchased by the contractor.

(b) In order to be exempt on such purchases, the contractor must be registered as a retail merchant, must obtain an exemption certificate from the exempt organization, and must issue an exemption certificate to his supplier.

IND. ADMIN. CODE tit. 45, r. 2.2–3–12(a) and (b) (1992). Consequently, in order for IP to receive the exemption that Galligan claims it is entitled to, Galligan must produce evidence that IP obtained an exemption certificate from the exempt organization and that it issued that exemption certificate to the supplier at the time of purchase. *See id.. See also Greensburg Motel Assoc., L.P. v. Indiana Dep't of State Revenue*, 629 N.E.2d 1302, 1304 (Ind. Tax Ct.1994) (stating that tax exemptions are strictly construed against the taxpayer and in favor of the state and the taxpayer bears the burden to show that it is entitled to the exemption). There is no better way to prove this than to submit into evidence the copies of the

---

**18.** More specifically, Galligan states that IP purchased items such as concrete and plumbing supplies for "jobs ... for the Town of Clarksville at Lincoln Heights [], the construction of a sanitary sewer system for the Town of Corydon [], the installation of a manhole valve pit for a school in Kentucky [], and work for the City of Jeffersonville on a sewer system located at Trucker's Boulevard[]." (Pet'r Br. at 17.) (*See also* Trial Tr. at 42–43, 53, 57–58, 62–64.)

contested invoices and actual exemption certificates themselves.[19]

While Galligan did not present the applicable exemption certificates at trial, he nevertheless asserts that he has "proven by a preponderance of the evidence that at the time of these purchases, [IP] had been issued an exemption certificate, and had provided an exemption certificate to its suppliers to obtain the exemption." (Pet'r Br. at 18.) More specifically, he claims "he has presented . . . invoices, [ ] personal knowledge, and [his testimony regarding] the customs and practices of his vendors, all *tending to show* that exemption certificates were obtained by [IP] for the jobs described." (Pet'r Br. at 18 (emphasis added).) For instance, at trial, Galligan presented copies of three invoices from vendors on which someone had written the words "tax-exempt." (Pet'r Exs. H, J, and M.) In addition, he testified, generally, that any time IP wanted to make a tax-exempt purchase from its vendors, IP was required to provide an exemption certificate; if it did not provide the certificate, the vendors would then charge sales tax. (Trial Tr. at 43, 54.)

■■ This evidence is insufficient to prove that IP received exemption certificates and presented them to its vendors at the time of purchase of the property at issue. An invoice or testimony that states something is "tax-exempt," without any supporting factual basis, does not necessarily make it so. Such a statement is nothing more than a conclusion. A taxpayer's conclusory statements do not constitute probative evidence and the Court will therefore not be persuaded thereby.[20] *See Anderson v. Indiana Dep't of State Revenue*, 758 N.E.2d 597, 600 n. 2 (Ind. Tax Ct.2001), *review denied; Sterling Mgmt.-Orchard Ridge Apartments v. State Bd. of Tax Comm'rs*, 730 N.E.2d 828, 833 (Ind. Tax Ct.2000) (footnote added).

## F. Use Tax on Miscellaneous Depreciated Items

■■■ In its audit report, the Department also assessed use tax on various items that were listed on IP's depreciation schedules. (*See* Resp't Ex. 1 at 22–24.) More specifically, the Department assessed use tax on certain purchases of computer equipment, radio equipment, vehicles, diesel fuel, as well as office remodeling costs. (*See* Resp't Ex. 1 at 22–24, 25–30.) Galligan claims that IP acquired those items through retail transactions and therefore paid sales tax on those items at the time of purchase. (*See* Trial Tr. at 57, 66–68, 71–77.) In turn, Galligan claims that because sales tax has already been paid on the items, the Department's assessment of use tax is in error.[21]

19. Consequently, the Department's auditor testified at trial that, in performing the audit, he did not impose tax on those purchases for which IP could produce the exemption certificate and on which he could verify that the property was indeed used in an exempt job. (Trial Tr. at 91.) Nevertheless, the auditor also stated that as long as IP could provide the exemption certificate number and the name and description of the job, he could cross-reference them to verify that the purchases were eligible for the exemption. (*See* Trial Tr. at 89–91; *see also* Resp't Br. at 10.)

20. As an aside, the Court notes that two of the three invoices submitted by Galligan had sales tax computed and added to the total amount due; at some subsequent point, however, the sales tax amount was "scribbled out." (*See* Pet'r Exs. H and J.) No explanation was provided by Galligan regarding these subsequent scribbles. While the "scribbles" have not caused this Court to discredit the invoices entirely, it does call into question their veracity.

21. Galligan also claims that "[t]he assessment of use taxes based on depreciation schedules is improper[.]" (Pet'r Br. at 20.) Galligan's claim, however, is "raised in a general manner and [is] not supported by specific argument or citation of authority." *See In re*

At trial, Galligan submitted invoices on similar purchases which he claims "established the custom and procedure of [IP] to purchase such items through retail establishments which require the payment of sales tax at the time of purchase, and furthermore, it shows that [IP] did pay sales tax when it purchased items similar to those being assessed by the auditor." (Pet'r Br. at 21.) (*See also* Pet'r Exs. P and Q.) He also asserted that in order to register and title the vehicles at issue, IP was required to provide proof to the Bureau of Motor Vehicles that the sales tax had been paid. (Pet'r Br. at 21.) As a result, Galligan claims he presented persuasive evidence that the sales tax had previously been paid on the items at issue. The Court disagrees.

The Department's regulations provide that "[t]he person who stores, uses, or consumes tangible personal property in Indiana may avoid paying the use tax to the Department if such person retains for inspection by the Indiana Department of Revenue a receipt evidencing payment of the [sales] tax." IND. ADMIN. CODE tit. 45, r. 2.2–3–27 (1992). *See also* IND. ADMIN. CODE tit. 45, r. 2.2–3–14(1) (1992). Thus, Galligan was required to present the original invoices on these purchases to the Department in order to avoid paying the use tax. He did not. The Department's assessment of tax on these items is therefore AFFIRMED.

## CONCLUSION

Based on the foregoing reasons, this Court finds that Galligan is not liable for IP's 1993 tax liabilities. Galligan can be held liable, however, for IP's unpaid sales/ use taxes for the 1994 and 1995 years. Nevertheless, Galligan has presented prima facie evidence that the Department's

*Kesler,* 272 Ind. 161, 397 N.E.2d 574, 576 (1979). Therefore, Galligan's claim "do[es]

assessments as discussed in Issues II(A), II(B), II(C), and II(D)(2),(3),(4),(5), and (6) were in error. Consequently, those audit findings are REVERSED and the Court REMANDS those matters to the Department to recalculate the amount of tax due. The Department's assessments as discussed in Issues II(D)(1), II(E), and II(F) are AFFIRMED.

not present an issue for determination by this Court." *See id.*