ATTORNEYS FOR PETITIONER
Gregory F. Zoeller
Attorney General of Indiana

Andrew W. Swain
Timothy A. Schultz
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR RESPONDENT
Jeffrey S. Dible
Indianapolis, Indiana

Martin I. Eisenstein
Stacy O. Stitham
Lewiston, Maine



# In the
# Indiana Supreme Court

No. 49S10-1108-TA-514

INDIANA DEPARTMENT OF STATE REVENUE,

*Petitioner (Appellee below),*

v.

AOL, LLC,

*Respondent (Appellant below).*

Appeal from the Indiana Department of State Revenue, No. 04-20080029R
April Bruce, Hearing Officer

On Petition for Review from the Indiana Tax Court, No. 49T10-0903-TA-00007
The Honorable Thomas G. Fisher, Judge

**March 16, 2012**

**Shepard, Chief Justice.**

Under a complex series of arrangements with people like paper suppliers, printers, and packagers, AOL procured promotional mailers it sent to Indiana residents. None of the players in these transactions, AOL says, should owe sales or use tax. The Tax Court agreed. We reverse.

**Facts and Procedural History**

AOL, LLC is an online service provider that allows its customers, known as members, to access the Internet, e-mail, instant messaging, and other proprietary content using AOL's client software. AOL conducted this business first as America Online, Inc., a Delaware corporation, and then as AOL, LLC after reorganizing itself into a Delaware limited liability company in 2006.

To sign up new members, AOL mailed packages containing copies of its client software on compact discs to prospective members. A prospective member could not access AOL's service without obtaining and installing AOL's client software on her computer. After signing up new members, AOL sought to retain them by sending them letters, brochures, and other promotional materials printed on paper.

A standard CD-ROM package contained the following components: (1) a CD storing a copy of AOL's client software; (2) a paper carrier or plastic case enclosing the CD; (3) printed promotional materials and instructions; and (4) terms and conditions of use. The package also bore a unique certificate number and password printed on its surface to allow a prospective member to sign up for AOL's service.

AOL did not physically manufacture the CD-ROM packages itself. Instead, AOL contracted with third-party vendors to produce the individual components and with third-party assembly houses to assemble the final packages from those individual components.

Roughly thirty-five percent of the time, AOL supplied its vendors with the necessary CDs, sometimes blank and other times already imprinted with AOL's client software. When AOL supplied blank CDs, the vendors charged AOL for imprinting the CDs with copies of AOL's client software and for applying graphics to the surface of the CDs. (Appellant's App. at 107.) When AOL supplied CDs already imprinted with its client software, the vendors charged

2

only for applying graphics to the surface of the CDs.  The rest of the time, the vendors supplied their own CDs.

As for the other individual components, AOL generally supplied its vendors with the paper and plastic necessary for producing the CD-ROM packages.  AOL apparently also supplied its vendors with some additional individual components sourced from Asia.  In contrast, the vendors generally supplied raw materials like ink and glue.

Next, the vendors would usually send the individual components to assembly houses that produced the final packages.  The assembly houses would then print the unique certificate numbers and passwords on the CD-ROM packages.  Occasionally, a single vendor would perform all these steps without the involvement of an assembly house.  AOL and the Department stipulate that the CD-ROM packages constituted a final product separate and distinct from the individual components, which merely constituted raw materials.  (Appellant's App. at 106.)

As with the CD-ROM packages, AOL itself did not physically print or produce the promotional materials it sent to current members, either.  Instead, AOL contracted with letter shops to print and produce the promotional materials.

Even so, AOL provided its letter shops with the paper they used to print the promotional materials.  Occasionally, AOL also provided other raw materials, such as ink and glue, but the letter shops usually purchased their own.  Regardless, AOL and the Department stipulate that the promotional materials constituted a final product separate and distinct from any raw materials used to produce them, just as in the case of the CD-ROM packages.  (Appellant's App. at 110.)

All these vendors, assembly houses, and letter shops were located outside Indiana, and they completed all their production and assembly steps outside Indiana, too.  None of these entities paid sales or use taxes on the CD-ROM packages or the promotional materials.  Once they finished producing and assembling the CD-ROM packages and printing the promotional materials, the vendors, assembly houses, and letter shops mailed them from shipment points

outside Indiana to prospective customers throughout the United States, including people in Indiana.

Between January 2003 and June 2007, AOL paid use taxes to the Indiana Department of State Revenue based on the number of CD-ROM packages and promotional materials it sent to prospective members in Indiana. In December 2006, however, AOL filed with the Department a claim for a refund of $349,551 it paid in use taxes between January 1, 2003, and November 30, 2006, plus interest. In June 2007, AOL filed a second claim for a refund of $21,913 it paid in use taxes between May 1, 2006, and June 30, 2007, plus interest.

After an investigation, the Department denied both the 2003 and the 2006 claims in written decisions. AOL filed an original tax appeal.

The Tax Court reversed the Department's determination. AOL, LLC v. Ind. Dep't of State Revenue, No. 49T10-0903-TA-7, 940 N.E.2d 870 (Ind. Tax Ct. 2011) (table). Noting that AOL owned all the raw materials provided to the assembly houses and letter shops, the Tax Court held that AOL did not purchase any tangible personal property in a retail transaction with either the assembly houses or the letter shops. Id. at *9. Instead, it held that AOL merely purchased assembly, printing, and mailing services. Id. at *10.

We granted review. Ind. Dep't of State Revenue v. AOL, LLC, ___ N.E.2d ___ (Ind. 2011) (table); see also Ind. Appellate Rule 63(A).

**Standard of Review**

Summary judgment is appropriate when the record shows that no genuine issues of material fact remain for trial and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). On appeal, we extend cautious deference to a decision within the special expertise of the Tax Court and will not reverse it unless the decision was clearly erroneous. Ind.

Dep't of State Revenue v. Belterra Resort Ind., LLC, 935 N.E.2d 174 (Ind. 2010), modified on reh'g, 942 N.E.2d 796 (Ind. 2011).  But we will set aside the Tax Court's decision on matters of tax law on summary judgment if we are definitely and firmly convinced that an error occurred. Id. at 177.


### AOL Purchased Tangible Personal Property in Retail Transactions


Indiana imposes both sales and use taxes.  The sales tax, also known as the state gross retail tax, applies to retail transactions that occur in Indiana.  Ind. Code § 6-2.5-2-1(a) (2010). The use tax applies to storing, using, or consuming in Indiana tangible personal property acquired in a retail transaction regardless of where that transaction occurred or where the retail merchant was located.  Ind. Code § 6-2.5-3-2(a) (2010).


These taxes are complementary in the sense that the use tax applies only to transactions that would be subject to the sales tax but escape it, usually because the transaction occurs outside Indiana.  Ind. Dep't of State Revenue v. Trump Ind., Inc., 814 N.E.2d 1017 (Ind. 2004); see also Ind. Code § 6-2.5-3-4(a) (2010) (exempt from use tax if sales tax paid on acquisition or if otherwise exempt from sales tax); Ind. Code § 6-2.5-3-5 (2010) (allowing credit against use tax for sales, purchase, or use taxes paid in another state).  Indeed, the purpose of the use tax is merely to prevent evasion of the sales tax.  Belterra Resort, 935 N.E.2d at 177.


As we restate it, the Department principally argues that AOL purchased the CD-ROM packages and promotional materials in retail transactions and later used them in Indiana.  (Pet.'s

5

Br. at 10–12.)[1]  According to the Department, the assembly houses and letter shops acquired raw materials to produce a final product for which AOL paid consideration.  (Pet.'s Br. at 10–12.)

AOL argues that it did not acquire the CD-ROM packages and promotional materials in any retail transactions because it merely purchased assembly and printing services.  (Resp.'s Br. at 9–13.)  AOL acknowledges that it may have purchased raw materials in retail transactions, and it may have used the CD-ROM packages and promotional materials in Indiana.  (See Resp.'s Br. at 9–10.)  But, AOL argues, its third-party contractors completely consumed the raw materials in producing final products that were separate and distinct from the raw materials.  (Resp.'s Br. at 10–13.)  In other words, AOL acquired raw materials in retail transactions but did not use them in Indiana, it used the final products in Indiana but did not acquire them in any retail transactions, and never the twain shall meet.

For support, AOL relies on a line of Tax Court decisions originating with Morton Bldgs., Inc. v. Ind. Dep't of State Revenue, 819 N.E.2d 913 (Ind. Tax Ct. 2004), review denied.  In Morton, a producer of prefabricated warehouses filed a claim for a refund of use taxes it paid on raw materials the producer stored and used to produce building components outside Indiana before using the components inside Indiana.  Id. at 914–15.  The Department denied the refund claim, but the Tax Court reversed.  The producer argued that it did not purchase the building components in retail transactions because it produced the components itself, and that it never used the raw materials in Indiana because it completely consumed the raw materials outside

---

[1] The Department has mixed in with this argument several other less helpful points.  For example, the Department has repeatedly claimed that Indiana Code § 6-2.5-5-3(a)(2) (2010) expressly treats commercial printers as manufacturers.  (Pet.'s Br. at 9; Appellant's App. at 67, 72, 74, 83.)  This section treats commercial printing as producing and manufacturing tangible personal property "for purposes of this section only," and the section exempts transactions involving machinery, tools, and equipment if a person acquired them to produce or manufacture other tangible personal property.  Ind. Code § 6-2.5-5-3 (emphasis added).  It is hard to see how this point is relevant to the question presented.

Indiana when producing the building components. Id. at 917–18. The Tax Court agreed, finding that the building components constituted a final product separate and distinct from the raw materials.

The Legislature later abrogated Morton by amending Indiana Code § 6-2.5-3-2 and adding subsection (d). Act of March 24, 2006, P.L. 162-2006, § 20, 2006 Ind. Acts 3223, 3249. Section 6-2.5-3-2(d) clarified that the use tax extends to any person who (1) manufactures, fabricates, or assembles tangible personal property from materials either within or outside Indiana; and (2) uses, stores, distributes, or consumes tangible personal property in Indiana. Ind. Code § 6-2.5-3-2(d).

The Tax Court later extended Morton's logic in two similar cases involving tax years that preceded Section 6-2.5-3-2(d)'s effective date. Ameritech Publ'g, Inc. v. Ind. Dep't of State Revenue, 916 N.E.2d 752, 752, 756 (Ind. Tax Ct. 2009) ("Ameritech II"), review denied; Ameritech Publ'g, Inc. v. Ind. Dep't of State Revenue, No. 49T10-0305-TA-26, at *1, *13 n.12, 855 N.E.2d 1096 (Ind. Tax Ct. 2006) (table) ("Ameritech I"), review denied. In the Ameritech cases, a phonebook publisher filed two claims for refunds of use taxes it paid on phonebooks it distributed to businesses and residents in Indiana. The Department denied both claims, but the Tax Court reversed. The phonebook publisher argued that it did not purchase the phonebooks in a retail transaction because it provided both the paper and the content, the raw materials, to the printer that actually produced the phonebooks, the final products. Ameritech II, 916 N.E.2d at 753–54; Ameritech I, at *3, *7. The Tax Court agreed, noting that the printer completely consumed the raw materials in producing a separate and distinct final product. Ameritech II, 716 N.E.2d at 754; Ameritech I, at *7–8.

The Department argues that Section 6-2.5-3-2(d) should apply here and should therefore render AOL's transactions retail transactions. (Pet.'s Br. at 7, 17–18.) AOL argues that the Tax Court correctly held Section 6-2.5-3-2(d) completely inapplicable because the plain meaning of the statute clearly reaches only a person who both manufactures tangible personal property and uses it in Indiana. (Resp.'s Br. at 13–15.) In doing so, the Tax Court noted that third-party

contractors, not AOL, manufactured the CD-ROM packages and promotional materials.  AOL, at *9 n.7.  The Tax Court's approach left Ameritech II and Ameritech I intact even as Section 6-2.5-3-2(d) abrogates Morton for tax years after Section 6-2.5-3-2(d)'s effective date,[2] thus permitting a finding that AOL did not purchase the CD-ROM packages and promotional materials in any retail transactions.

Indeed, if the Legislature truly intended Section 6-2.5-3-2(d) to sweep transactions like Ameritech's and AOL's within the ambit of the use tax, then it may be that it employed a scalpel when a hatchet was called for.  Nevertheless, we conclude that a straightforward application of other sections in the Indiana Code already achieves the same result.

A retail transaction includes any transaction that constitutes (1) selling at retail as described in Indiana Code § 6-2.5-4-1 (2010); (2) making a wholesale sale as described in Indiana Code § 6-2.5-4-2 (2010); or (3) a transaction described in any other section of Indiana Code § 6-2.5-4.  Ind. Code § 6-2.5-1-2(a) (2010).  Under Indiana Code § 6-2.5-4-1(b), a person engages in selling at retail when he acquires tangible personal property for the purpose of resale and transfers that property to another person for consideration, all in the ordinary course of his business.

As a preliminary matter, we note that Article 2.5, which sets out the sales and use taxes, defines very few of Section 6-2.5-4-1's terms in Chapter 1, which lists definitions for the rest of Article 2.5.  Tangible personal property includes any movable item in which a person has rights and that one can see, weigh, measure, feel, touch, or perceive in any other way with his senses.

_____

[2] The Tax Court's holding ran contrary to dicta in its unpublished decision in Ameritech I, in which the Tax Court expressed the view that Section 6-2.5-3-2(d) would have dictated the opposite result had it gone into effect before the tax years at issue.  See Ameritech I, at *13, n.12.  Lest the Tax Court's reversal on Section 6-2.5-3-2(d)'s application to situations like those in the Ameritech cases leave any doubt, we think Section 6-2.5-3-2(d) clearly abrogated the result in Morton, in which the same entity purchased and completely consumed raw materials in producing a separate and distinct final product.

8

Ind. Code § 6-2.5-1-27 (2010). We think it plain that acquiring tangible personal property entails merely gaining possession or control of it. See Black's Law Dictionary 26 (9th ed. 2009).

A person acquires tangible personal property for the purpose of resale when he intends to transfer it to another person. See Monarch Beverage Co., Inc. v. Ind. Dep't of State Revenue, 589 N.E.2d 1209, 1210, 1212 (Ind. Tax Ct. 1992). And, of course, a person transfers tangible personal property when he actually passes title to another person. See id. at 1213. Drawing on contract law, we defined consideration on our only prior occasion to construe Section 6-2.5-4-1(b) as a benefit accruing to the promisor or a detriment to the promisee—the classic bargained-for exchange. Belterra Resort, 935 N.E.2d at 179.

The heart of this dispute, however, seems to turn on Section 6-2.5-4-1(b)'s use of the phrase "that property," a phrase that suggests that a retail merchant must acquire tangible personal property and then transfer that same property to a purchaser for either the sales or use taxes to apply. But as in so many other areas of law, to him who reads the entire statute go the spoils. Subsection (c) of the very same section makes it clear that "[f]or the purposes of determining what constitutes selling at retail, it does not matter whether . . . the property is transferred in the same form as when it was acquired." Ind. Code § 6-2.5-4-1(c)(1).

To our knowledge, Monarch Beverage represents the only time the Tax Court has construed Section 6-2.5-4-1(c)(1), and then only at a glance. In Monarch Beverage, a trucking company filed a claim for a refund of sales and use taxes it paid on trailers it acquired from a manufacturer that acquired the parts and materials to produce those trailers. Monarch Beverage, 589 N.E.2d at 1210. The Department denied the claim, and the Tax Court affirmed. The Tax Court concluded that the manufacturer was selling at retail even though the manufacturer acquired parts and materials but transferred trailers to the trucking company. Id. at 1212. Citing Section 6-2.5-4-1(c)(1) in a footnote, the Tax Court noted that "[t]he property transferred does not have to be in the same form as when it was acquired." Id. at 1212 n.9.

Given the tension between the phrase "that property" and Section 6-2.5-4-1(c)(1), we think the sole purpose of Section 6-2.5-4-1(c)(1) is to prevent a person from arguing that a merchant was not selling at retail merely because the merchant changed the form of property between acquiring it and transferring it.[3] Section 6-2.5-4-1(c)(1) should have prevented decisions like Ameritech II and Ameritech I.

Here, we think the assembly houses and letter shops were selling at retail. The assembly houses and letter shops acquired tangible personal property when they took possession of the individual components. That they did so for the purpose of resale is clear not only from the fact that neither AOL nor any third-party contractors ever paid any sales or use taxes on the raw materials, but also—and more importantly—from the fact that the assembly houses and letter shops completely consumed the raw materials, regardless of who provided them, to produce a separate and distinct final product that previously did not exist at all. AOL may have had title in the raw materials, but it could not have title in the final products until they came into existence. As AOL paid consideration and received title to goods in which it previously had none, we think a sale of goods occurred. The assembly houses and letter shops transferred that property to a person for consideration, its changed form notwithstanding, when they mailed the CD-ROM packages and promotional materials to AOL's prospective and current members at AOL's request and in exchange for payment from AOL.

---

[3] One might argue that whether a merchant transfers property in the same form as he acquired it should not matter for the purposes of determining whether the merchant acquired the property for the purpose of resale, either. We do not agree. Section 6-2.5-4-1(b), which determines whether a person is selling at retail, further subdivides into subsections (1) and (2), the first of which refers to acquiring tangible personal property for the purpose of resale, and the second of which refers to transferring that property to another person for consideration. Section 6-2.5-4-1(c) then sets out three manners in which "the property is transferred" that are immaterial for the purposes of determining whether a person is selling at retail. In other words, we think Section 6-2.5-4-1(c) modifies the analysis in Section 6-2.5-4-1(b)(2) only.

Because the assembly houses and letter shops were selling at retail, the transactions between AOL and its assembly houses and letter shops constituted retail transactions that triggered Indiana's use tax once AOL used the property in Indiana.

## Conclusion

For the reasons stated above, we therefore reverse the Tax Court.

Dickson, Sullivan, Rucker, and David, JJ., concur.