ATTORNEYS FOR PETITIONER:

**ROBERT A. ROMACK**
**DAN R. DUNBAR**
DUNBAR & ROMACK
Franklin, IN

ATTORNEYS FOR RESPONDENT:

**GREGORY F. ZOELLER**
ATTORNEY GENERAL OF INDIANA
**JESSICA REAGAN GASTINEAU**
**JOHN P. LOWREY**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT



FILED

May 19 2016, 2:46 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| | |
|---|---|
| MILLER PIPELINE CORPORATION, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Cause No. 49T10-1012-TA-00064 |
| ) | |
| INDIANA DEPARTMENT OF ) | |
| STATE REVENUE, ) | |
| ) | |
| Respondent. ) | |

## ON APPEAL FROM A FINAL DETERMINATION OF
## THE INDIANA DEPARTMENT OF STATE REVENUE

**FOR PUBLICATION**
**May 19, 2016**

FISHER, Senior Judge

Miller Pipeline Corporation has appealed from the Indiana Department of State Revenue's denial of its claim for refund of sales/use taxes remitted for the 2006 and 2007 tax years (the years at issue). The issue before the Court is whether the Department erred in denying that refund claim.

## FACTS AND PROCEDURAL HISTORY

Miller Pipeline, an underground utility contractor, installs, removes, and repairs underground gas, water, and sewer pipelines. In 2008, Miller Pipeline filed several claims

with the Department seeking refunds of the sales or use taxes it remitted on various purchases made in 2005, 2006, and 2007. Those multiple filings most likely precipitated the Department's audit of Miller Pipeline in 2009. (See, e.g., Oral Arg. Tr. at 9-10, Jan. 27, 2014.)

To conduct that audit, the Department determined that it would utilize the statistical sample method. (Pet'r Trial Ex. 1 at 87-91; Trial Tr. at 175-76, Nov. 4, 2013.) Thus, the Department randomly selected 1,356 invoices from Miller Pipeline's accounts payable system to review. (See Pet'r Trial Ex. 1 at 88; Trial Tr. at 139-40, 147-49, 179-81.) In reviewing those invoices, if Miller Pipeline remitted tax on the underlying transaction and it was not required to, the Department would record the amount of the invoice upon which tax was paid as a negative adjustment. (See Trial Tr. at 105, 154-55, 182.) If, however, Miller Pipeline should have remitted tax on the underlying transaction but did not, the Department would record the taxable amount of the invoice as a positive adjustment. (See, e.g., Pet'r Trial Ex. 1 at 66.) Finally, if Miller Pipeline remitted the proper amount of tax due on the underlying transaction, the Department would record a "zero" adjustment. (See Trial Tr. at 136-37, 154-55.)

Once the invoices had been reviewed, the Department tallied all its recorded adjustments and divided that figure by the total amount of all the invoices. (See, e.g., Pet'r Trial Ex. 1 at 65, 88.) The result of that calculation was then used to compute a factor that, when applied to all of Miller Pipeline's 2006 and 2007 accounts payable transactions, would estimate an overall tax liability or refund opportunity for those years. (See, e.g., Pet'r Trial Ex. 1 at 65, 88.)

The Department completed its audit of Miller Pipeline and issued an audit report on September 10, 2009. (Pet'r Trial Ex. 1 at 1.) In the report, the Department addressed Miller Pipeline's multiple refund claims, granting and denying each one in part. (See, e.g., Pet'r Trial Ex. 1 at 2, 20-59.) The Department also determined, through its statistical sample, that Miller Pipeline had been deficient in remitting sales/use taxes during the years at issue. (See, e.g., Pet'r Trial Ex. 1 at 2.) The Department subsequently issued Proposed Assessments against Miller Pipeline totaling $84,647.96 for the 2006 and 2007 tax years.[1] (See Pet'r Trial Ex. 1 at 1-2; Resp't Trial Ex. C.) Miller Pipeline paid the Proposed Assessments in their entirety on October 23, 2009.

On March 24, 2010, Miller Pipeline filed another claim with the Department seeking a refund of sales/use taxes in the amount of $104,318.39.[2] The Department subsequently denied that refund claim and, on December 21, 2010, Miller Pipeline initiated this original tax appeal. After the Court issued two decisions on interim matters,[3] Miller Pipeline's appeal proceeded to trial in November of 2013. The Court heard oral argument on January 27, 2014. Additional facts will be supplied when necessary.

## STANDARD OF REVIEW

This Court reviews final determinations of the Department de novo. See IND. CODE §§ 6-8.1-5-1(i), -9-1(d) (2016). Accordingly, the Court is not bound by either the evidence

---

[1] The Proposed Assessments, which had been reduced by the amount of Miller Pipeline's refund claims that had been granted, included interest. (Pet'r Trial Ex. 1 at 2; Resp't Trial Ex. C; Trial Tr. at 175, Nov. 4, 2013.)

[2] The Department explains that Miller Pipeline must necessarily believe that the statistical sample should have resulted in a refund of $19,670.43, not Proposed Assessments of $84,647.96. (See Resp't Br. at 3, Jan. 7, 2014.)

[3] See Miller Pipeline Corp. v. Indiana Dep't State Revenue, 995 N.E.2d 733 (Ind. Tax Ct. 2013); Miller Pipeline Corp. v. Indiana Dep't State Revenue, Case No. 49T10-1012-TA-00064, slip op. (Ind. Tax Ct. Dec. 7, 2012).

3

or the issues presented to the Department at the administrative level. See Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

## LAW

Indiana imposes sales tax "on retail transactions made in Indiana." See IND. CODE § 6-2.5-2-1(a) (2006). A retail transaction occurs when a retail merchant, in the ordinary course of his regularly conducted trade or business, "(1) acquires tangible personal property for the purpose of resale; and (2) transfers that property to another person for consideration." IND. CODE § 6-2.5-4-1(a), (b) (2006). The person who purchases the tangible personal property in the retail transaction is liable for the sales tax. I.C. § 6-2.5-2-1(b).

Indiana also imposes a use tax "on the storage, use, or consumption of tangible personal property in Indiana if the property was acquired in a retail transaction, regardless of the location of that transaction or of the retail merchant making that transaction." IND. CODE § 6-2.5-3-2(a) (2006). The use tax is complementary to the sales tax in that it applies only to transactions that would have been subject to the sales tax but for some reason have escaped it. Indiana Dep't of State Revenue v. AOL, LLC, 963 N.E.2d 498, 501 (Ind. 2012). The person who stores, uses, or consumes the tangible personal property in Indiana is liable for the use tax. See IND. CODE § 6-2.5-3-6(b) (2006).

## ANALYSIS

On appeal, Miller Pipeline challenges the Department's denial of its March 24, 2010 refund claim. In doing so, however, Miller Pipeline contests the Department's treatment of

29 transactions that were contained within the audit's statistical sample.[4,5]  Thus, Miller Pipeline's refund claim constitutes a collateral attack on the Department's Proposed Assessments and the audit report upon which they are based.  The Legislature has specifically provided that "[t]he notice of [a] proposed assessment is prima facie evidence that the department's claim for the unpaid tax is valid."  I.C. § 6-8.1-5-1(c) (emphasis added).  Consequently, "[t]he burden of proving that the proposed assessment is wrong rests with the person against whom the proposed assessment is made."  I.C. § 6-8.1-5-1(c).

I.

In July of 2007, Miller Pipeline made a $52,250 purchase, via invoice number 7417, from Midwestern Manufacturing Company.  (See Pet'r Trial Ex. 2 at 9; Trial Tr. at 15, 18 (providing that $47,250 was attributable to the purchase of equipment and $5,000 was attributable to an equipment mounting charge).)  In August of 2007, Miller Pipeline made another $41,060 purchase from Midwestern Manufacturing Company via invoice number 7504.  (See Pet'r Trial Ex. 4 at 10; Trial Tr. at 22-23 (providing that $39,060 was attributable to the purchase of equipment and $2,000 was attributable to an equipment mounting change).)  During trial, Miller Pipeline presented several documents that, when

---

[4] In its petition, Miller Pipeline challenged the Department's treatment of 47 transactions within the statistical sample.  (Pet'r Am. Original Tax Appeal [from] Final Determination Indiana Dep't State Revenue Denying Claim Refund Indiana Sales/Use Tax at ¶¶ 25-61.)  During trial, however, Miller Pipeline presented evidence and argument relating to the 29 transactions that are discussed within this opinion.  (See generally Pet'r Trial Exs. 1-17, 19-33; Trial Tr.; Pet'r Post-Trial Br. ("Pet'r Br."), Dec. 5, 2013.)  Consequently, any issues Miller Pipeline had with the other 18 transactions have been waived.

[5] To the extent Miller Pipeline has grouped its arguments on, and evidence relating to, the 29 transactions into 11 discrete issues, (see, e.g., Pet'r Br.), the Court will organize its analysis and rulings in the same manner.

read in conjunction with the testimony of its controller, demonstrated that it paid use tax with respect to each of these two transactions twice. (See Pet'r Trial Exs. 2-4; Trial Tr. at 12-23 (explaining that as to invoice number 7417, Miller Pipeline remitted $3,135 in August of 2007 on the entire $52,250 invoice and then another $2,835 in September 2007 on the equipment purchase only; as to invoice number 7504, Miller Pipeline made two use tax payments in October 2007: one for $2,463.60 on the entire invoice amount of $41,060 and the other for $2,343.60 on the equipment purchase only).) Miller Pipeline therefore claims it is entitled to a refund of the two tax payments it erroneously made. (See Pet'r Post-Trial Br. ("Pet'r Br.") at 2, 14-15, Dec. 5, 2013.)

In response, the Department presented its Proposed Assessments as evidence, (see Resp't Trial Ex. C; Trial Tr. at 173), arguing that Miller Pipeline had not rebutted their presumption of validity. More specifically, the Department has explained that its auditor testified during trial that if a taxpayer determines that it accidentally paid tax twice, the taxpayer can credit itself for that tax in a later month. (Resp't Br. at 8 (citing Trial Tr. at 141), Jan. 7, 2014.) The Department argues that while Miller Pipeline may have demonstrated that it paid use tax twice on each transaction, it has not produced any evidence to demonstrate that it did not already credit itself for the two erroneous tax payments. (See Resp't Br. at 8.) Consequently, the Department maintains that Miller Pipeline is not entitled to a refund as to this issue.

As previously noted, the Department's Proposed Assessments constitute prima facie evidence that its claim for the unpaid tax is valid. See I.C. § 6-8.1-5-1(c). The presumption of validity afforded the Department's Proposed Assessments was rebutted, however, when Miller Pipeline came forward with evidence demonstrating that it paid use

6

tax on each of the subject transactions twice. At that point, the burden to produce rebuttal evidence shifted to the Department. See Longmire v. Indiana Dep't of State Revenue, 638 N.E.2d 894, 898 (Ind. Tax Ct. 1994). Thus, the Department – not Miller Pipeline – bore the burden to produce evidence demonstrating that Miller Pipeline already credited itself for the duplicate payments. Because the Department has not produced such evidence, Miller Pipeline succeeds on its claim with respect to this issue.

Miller Pipeline has demonstrated that it overpaid use tax with respect to Midwestern Manufacturing's invoice numbers 7417 and 7504. Accordingly, the Department's Proposed Assessments as they relate to this issue are REVERSED. The Court REMANDS the matter to the Department with instructions to make two negative adjustments within the statistical sample to account for the $3,135 overpayment on Midwestern Manufacturing's invoice number 7417 and the $2,463.60 overpayment on invoice number 7504.[6,7] (Compare Pet'r Trial Ex. 1 at 86 with Trial Tr. at 105-07, 117-18.)

II.

In March of 2006, Miller Pipeline paid United Utilities Construction Company $949,006 for the purchase of its rolling stock, equipment, and tools. (See Pet'r Trial Ex. 5; Trial Tr. at 23-28.) In May of 2006, Miller Pipeline remitted to the Department a use tax payment of $36,687.36 attributable to this transaction. (See Trial Tr. at 29-31, 119-21;

---

[6] These amounts reflect the use tax payments Miller Pipeline erroneously remitted on the entire invoice amounts. See supra pp. 5-6; 45 IND. ADMIN. CODE 2.2-4-2 (2006) (see http://www.in.gov/legislative.iac/) (indicating that generally, services are not subject to taxation).

[7] The Court notes that the Department recorded the total invoice amounts for invoice numbers 7417 and 7504 as $47,250 and $39,060, not $52,250 and $41,060 (i.e., it pulled out the service components entirely). (Compare Pet'r Trial Ex. 1 at 86 with Pet'r Trial Exs. 2 at 9, 4 at 10.) This was in error. Accordingly, the Department should also adjust its statistical sample to reflect the invoices' actual amounts of $52,250 and $41,060.

Pet'r Trial Ex. 6.) Miller Pipeline explains on appeal, however, that it should not have remitted that tax: the purchase was accomplished through a "casual sale" and casual sales are not subject to taxation. (See Pet'r Br. at 3, 15-16.) See also 45 IND. ADMIN. CODE 2.2-1-1(d) (2006) (see http://www.in.gov/legislative.iac/) (stating that tax "is not imposed on gross receipts from casual sales except for gross receipts from casual sales of motor vehicles and sales of rental property"). Accordingly, Miller Pipeline now requests a refund of the use tax payment it erroneously made. (Pet'r Br. at 3, 15-16.)

The Department argues, however, that Miller Pipeline is not entitled to a refund as to this issue because it "did not present any evidence or make any arguments to support its allegation that the transaction was a casual sale." (Resp't Br. at 13.) The Court disagrees.

"A casual sale is an isolated or occasional sale by the owner of tangible personal property purchased or otherwise acquired for his use or consumption, where he is not regularly engaged in the business of making such sales." 45 I.A.C. 2.2-1-1(d). During trial, Miller Pipeline's controller testified that United Utilities, another underground utility contractor, sold its rolling stock, equipment, and tools to Miller Pipeline because it was going out of business. (Trial Tr. at 28.) That testimony is sufficient to support the conclusion that United Utilities sold its rolling stock, equipment, and tools in a casual sale. Consequently, the burden again shifted back to the Department to present evidence that would rebut that conclusion. See Longmire, 638 N.E.2d at 898. As the trial transcript demonstrates, however, the Department provided no evidence that indicated that United Utilities was regularly engaged in the business of selling rolling stock, equipment, or tools. (See generally Trial Tr.) Moreover, the Department did nothing to impeach the controller's

8

testimony or credibility. (See, e.g., Trial Tr. at 87-97 (providing the Department's cross-examination of Miller Pipeline's controller).) Thus, the Court finds that the Department failed to rebut Miller Pipeline's evidence with respect to this issue.

Miller Pipeline has demonstrated that it erroneously paid $36,687.36 in use tax to the Department with respect to its United Utilities' transaction. Accordingly, the Department's Proposed Assessments as they relate to this issue are REVERSED. The Court REMANDS the matter to the Department with instructions to make the appropriate negative adjustment to the statistical sample to account for that erroneous use tax payment. (Compare Pet'r Trial Ex. 1 at 84 with Trial Tr. at 31, 118-19.)

III.

On February 19, 2007, Miller Pipeline issued a check to Distribution Contractors Association for $21,250.00. (Pet'r Trial Ex. 7 at 1.) During trial, Miller Pipeline's controller testified that Miller Pipeline issued that check because it had bid on, and won, numerous items at a silent auction conducted by Distribution Contractors, a not-for-profit trade association. (Trial Tr. at 32-33, 36.) (See also Pet'r Trial Ex. 7 at 4-5.) Miller Pipeline also demonstrated that the items it won had been donated to Distribution Contractors by other companies. (See Pet'r Tr. Ex. 7 at 4-5.)

In its audit report, the Department concluded that Miller Pipeline should have, but failed to, remit tax on this transaction. (See, e.g., Pet'r Trial Ex. 1 at 82 (indicating a positive adjustment of $21,250 for the transaction in the statistical sample).) On appeal, Miller Pipeline argues that the Department's conclusion was improper: the tangible personal property that it ultimately won was never acquired by Distribution Contractors in a retail transaction for the purpose of resale. (Pet'r Br. at 16-17.) Thus, as Miller Pipeline

9

explains, because Distribution Contractors' acquisition of the subject tangible personal property was never subject to sales tax, Miller Pipeline's subsequent acquisition of that tangible personal property from Distribution Contractors was not subject to use tax. (See Pet'r Br. at 16-17 (citing I.C. § 6-2.5-4-1).) See also AOL, 963 N.E.2d at 501 (stating that the use tax applies only to transactions that would have been subject to the sales tax but for some reason have escaped it).

In response, the Department has merely explained that while Miller Pipeline claims in its written brief that it made "a donation" to Distribution Contractors, Miller Pipeline never showed how paying $21,250 in exchange for certain items constituted "a donation." (See Resp't Br. at 15 (citing Pet'r Br. at 16).) (See also Trial Tr. 94-95.) The Department's response, however, does not address the substance of Miller Pipeline's evidence or its argument as to this issue.

Miller Pipeline has shown that it was not required to remit use tax on its transaction with Distribution Contractors and the Department has failed to rebut that showing. As a result, the Department's Proposed Assessments as they relate to this issue are REVERSED. On remand, the Department is instructed to record a zero adjustment for this transaction in the statistical sample instead of a positive adjustment of $21,250. (Compare Pet'r Trial Ex. 1 at 82 with Trial Tr. at 136-37, 154-55.)

IV.

During the audit, Miller Pipeline was unable to produce four invoices that had been selected for review within the statistical sample: invoice numbers 173782, 36024, 783403, and 751516, all from Pomp's Tire Service, Inc. (See Pet'r Trial Ex. 1 at 66, 70, 74; Trial Tr. at 94.) As a result, the Department deemed all four invoices taxable in their entirety,

recording positive adjustments for each. (See Pet'r Trial Ex. 1 at 66, 70, 74.) See also I.C. § 6-8.1-5-1(b) (explaining that the Department shall make proposed assessments based on the best information available to it); IND. CODE § 6-8.1-5-4(a) (2006) (indicating what financial records a taxpayer needs to keep and provide the Department access to). Miller Pipeline paid the use tax as imposed by the Department on those transactions.

During trial, however, Miller Pipeline produced the four missing invoices. More specifically, Miller Pipeline presented invoice numbers 173782, 36024, 783403, 751516 from Petro's Tire Sales & Service. (See Pet'r Trial Exs. 8 at 3, 9 at 5, 10 at 18, 11 at 10; Trial Tr. at 37-45.) Miller Pipeline's controller explained that Pomp's acquired Petro's in 2007 (after the subject transactions occurred in 2006) and when that happened, Miller Pipeline changed the vendor name in its accounts payable system from "Petro's" to "Pomp's" but did not change the names as it related to the invoices. (See Trial Tr. at 37-39.) As a result, Miller Pipeline was unable to directly locate any invoices for "Pomp's" during the audit.

These four invoices, along with their accompanying documentation and the testimony of Miller Pipeline's controller, clearly reflect that Miller Pipeline remitted sales tax on the material component of the underlying transactions.[8] Consequently, as Miller Pipeline correctly explains, it does not also owe use tax on these transactions. (See Pet'r Br. at 17-18 (citing IND. CODE § 6-2.5-3-4(a)(1) (2006) (explaining that the storage, use, and consumption of tangible personal property in Indiana is exempt from use tax when it was acquired in a retail transaction in Indiana and the sales tax was paid on the acquisition of that property)).)

---

[8] Each of the four invoices lists a service charge and a materials charge. (See Pet'r Trial Exs. 8 at 3, 9 at 5, 10 at 18, 11 at 10.)

11

The Department does not contest Miller Pipeline's explanation that the Pomp's invoices flagged for the statistical sample were actually the Petro's invoices that were submitted at trial. Instead, the Department simply argues that Miller Pipeline was prohibited from presenting those four invoices to the Court during trial. Indeed, it complains that:

> If the taxpayer is allowed to present a completely new case to the court, without producing evidence of mistake of fact or law at the administrative level, the audit process would become interminable and unworkable. Specifically, there would be no enforceable requirement that the taxpayer participate in the audit process. The taxpayer would effectively be relieved of its statutory duty to provide records to the Department, and the Department's ability to conduct an audit would be severely hampered.
> Moreover, any effort by the Department to secure a reliable and accurate assessment would be frustrated, and the entire administrative review process would be in jeopardy of becoming superfluous and meaningless.

(Resp't Br. at 10-11 (citation omitted).)

The Court does not find the Department's argument persuasive for the following reasons. First, Miller Pipeline provided the reason – "the mistake of fact" – why it could not locate the four invoices during the audit. See supra p. 11. Second, the Department received the invoices from Miller Pipeline in September of 2013. (See Trial Tr. at 94; Resp't Br. at 2.) Thus, the Department had ample time to resolve the issue itself before the matter proceeded to trial. Finally, the Court is not precluded from considering those invoices on appeal given its statutorily prescribed de novo standard of review. See I.C. §§ 6-8.1-5-1(c), -9-1(d).

Miller Pipeline has shown that it was not required to remit use tax on the four subject transactions with Petro's/Pomp's. As a result, the Department's Proposed Assessments as they relate to this issue are REVERSED. The Court REMANDS the

12

matter to the Department with instructions to adjust its statistical sample to reflect zero adjustments for those four transactions instead of positive adjustments. (Compare Pet'r Trial Ex. 1 at 66, 70, 74 with Trial Tr. at 136-37, 154-55.)

V.

On October 8, 2007, Miller Pipeline purchased an air compressor from Ingersoll-Rand Equipment for $12,647. (Pet'r Trial Ex. 12 at 1, 3-4.) Miller Pipeline did not remit any sales tax on this transaction at the point of purchase. (See Pet'r Trial Ex. 12 at 1, 3.) The Department subsequently determined that the transaction was subject to tax. (See Pet'r Trial Ex. 1 at 78 (indicating a positive adjustment of $12,647 for the transaction within the statistical sample).)

During trial, Miller Pipeline's controller testified that Miller Pipeline sold the air compressor to one of its customers. (Trial Tr. at 45-46.) Consequently, Miller Pipeline argues on appeal that it was not required to remit any tax on this transaction (and is thus entitled to a refund of the tax it did pay) pursuant to the purchase for resale exemption. (See Pet'r Br. at 18-19.)

Indiana's purchase for resale exemption provides that "[t]ransactions involving tangible personal property . . . are exempt from [sales] tax if the person acquiring the property acquires it for resale, rental, or leasing in the ordinary course of the person's business without changing the form of the property." IND. CODE § 6-2.5-5-8(b) (2006). The issue before the Court is not whether Miller Pipeline sold the air compressor to one of its customers. See, e.g., Galligan v. Indiana Dep't of State Revenue, 825 N.E.2d 467, 477 n.8 (Ind. Tax Ct. 2005) (explaining that unless it is shown otherwise, the Court will presume that a witness, who is sworn under oath, is telling the truth), review denied.

13

Rather, the issue before the Court is whether Miller Pipeline acquired the subject air compressor in the ordinary course of its business <u>for the purpose of resale</u>.  <u>See</u> I.C. § 6-2.5-5-8(b).

The only evidence presented at trial with respect to this issue, apart from the invoice from Ingersoll-Rand, was the testimony of Miller Pipeline's controller.  He stated:

Q:  And what was involved in this transaction?

A:  We had purchased this air compressor, and we use air compressors of this type in our work, but we also from time to time sell them to our customers, and this particular air compressor, dealing with this invoice, we sold to one of our customers.

*****

Q:  I believe you said that the invoice . . . was an air compressor that Miller Pipeline had purchased; is that correct?

A:  Yes.

Q:  Do you remember when the Department deposed you and we discussed this air compressor?

A:  Yes.

Q:  Isn't it true that in your deposition you explained that Miller Pipeline purchases anywhere from 15 to 30 of these air compressors a year?

A:  Yes.

Q:  And isn't it true that you explained that roughly half of the time, Miller Pipeline uses these industrial-sized [air compressors on] trucks for itself?

A:  Yes.

Q:  And that the other half of the time, the air compressors are not installed on trucks?

A:  We also have them installed on trucks that we also sell to our customers.

Q: Isn't it true that in your deposition, you explained that trucks are only sold to customers very rarely?

A: Correct.

Q: And you said that maybe Miller Pipeline sells one truck to a customer every two years?

A: Probably one to two, yeah, correct.

(Trial Tr. at 45-46, 95-96.) From this testimony, it is impossible to determine what Miller Pipeline's purpose was in acquiring the subject air compressor (i.e., whether it was for the purpose of resale or whether Miller Pipeline initially acquired it for its own use). Accordingly, the Court must AFFIRM the Department's treatment of this transaction within the statistical sample.[9]

VI.

In December of 2006, Miller Pipeline received an invoice from Vacuworx International for $5,821.75. (See Pet'r Trial Ex. 13 at 10-11.) Of that amount, $4,149.75 was attributable to the purchase of equipment and $1,672.00 was attributable to a labor charge. (See Pet'r Trial Ex. 13 at 10-11.) In January of 2007, Miller Pipeline remitted to the Department a use tax payment for the month of December in the amount of $6,835.97. (See Pet'r Trial Ex. 13 at 1-2.) Miller Pipeline's controller testified that the $6,835.97 included a use tax payment of $248.98 on the equipment purchase portion of its transaction with Vacuworx. (See Trial Tr. at 46-50.) As a result, Miller Pipeline claims the

---

[9] Miller Pipeline also argued that this transaction was exempt from tax under Indiana Code § 6-2.5-5-6. (See Pet'r Br. at 18-19 (indicating that the air compressor in question might have been installed on a truck that Miller Pipeline sold to its customer).) See also IND. CODE § 6-2.5-5-6 (2006) (stating that "[t]ransactions involving tangible personal property are exempt from [sales] tax if the person acquiring the property acquires it for incorporation as a material part of other tangible personal property which [he] manufactures[ or] assembles . . . for sale in his business").) Again, however, the testimony of Miller Pipeline's controller does nothing to support this legal conclusion. (See Trial Tr. at 45-46, 95-96.)

Department erred when, in its statistical sample, it assessed use tax on the equipment portion of the subject transaction again. (See Pet'r Br. at 19-20.) (See also Pet'r Trial Ex. 1 at 81 (showing a positive adjustment of $4,149.75 for the transaction within the statistical sample).)

During trial, Miller Pipeline's controller explained that when Miller Pipeline made monthly use tax payments to the Department, it would collect the back-up information that substantiated the amount of the remittance (a report culled from its accounts payable system as well as any "extraneous" invoices that were not captured by the report) and attach it to a copy of the payment voucher. (See Trial Tr. at 14-15, 46-47.) Here, however, Miller Pipeline's back-up information does not substantiate the amount it actually remitted to the Department. (Compare Pet'r Trial Ex. 13 at 1-2 (showing that Miller Pipeline remitted $6,835.97 to the Department) with 7-11 (indicating that Miller Pipeline owed $7,023.73).) Because Miller Pipeline's numbers "don't add up," the Court cannot be certain that Miller Pipeline did in fact remit use tax on this transaction. The Court therefore AFFIRMS the Department's treatment of this transaction within the statistical sample.

VII.

Several invoices that were selected for review within the Department's statistical sample were also the subject of Miller Pipeline's previously filed refund claims. (Compare Pet'r Br. at 20-22 and Pet'r Trial Ex. 1 at 32, 35, 43-44 with Pet'r Trial Ex. 1 at 66, 71, 75-77 (indicating that at issue are invoice numbers 8753, 8923, and 8934 from E&R Machine Co., Inc.; invoice number IC4539 from Indy Custom Machine, Inc.; invoice number 112938 from Cra-Wal Container Co.; and invoice number 824094 from Central Steel & Wire Co.).) (See also Trial Tr. at 99-103, 184-85.) Prior to conducting the audit, the Department

16

indicated to Miller Pipeline that those invoices could be dealt with in two different ways. (See Trial Tr. at 175-76.)   First, Miller Pipeline could withdraw its refund claims with respect to those transactions entirely, and they would be reviewed and dealt with via their placement within the statistical sample.  (Trial Tr. at 181-82; Resp't Br. at 9.)   Alternatively, the Department could deal with those transactions within the context of Miller Pipeline's refund claims; if, in turn, the refund claim was granted with respect to a particular transaction, that transaction would then be given a zero adjustment within the statistical sample.  (Trial Tr. at 102-03, 181, 185; Resp't Br. at 8-9.)   Ultimately, Miller Pipeline did not withdraw its refund claims.  (See Pet'r Trial Ex. 1 at 2-8, 20-59; Trial Tr. at 182-83, 186-88; Resp't Br. at 9.)

Now, on appeal, Miller Pipeline argues that the methodology used by the Department in dealing with these particular transactions was erroneous.  Specifically, Miller Pipeline explains that its expert witness testified during trial that in order to maintain the viability of a statistical sample, every item chosen for that sample had to be dealt with and not simply skipped over.  (See Trial Tr. at 155-56.)  The expert stated that by dealing with the transactions as it did, however, the Department introduced a subjectivity into the sample. (See Trial Tr. at 155-56.)  Consequently, Miller Pipeline argues that "[b]y failing to make a positive or negative adjustment of the sample items within the sample, the Department negated the validity of the sample."   (Pet'r Br. at 20.)   The Department contends, however, that had it made such adjustments, Miller Pipeline would have received a refund on those particular transactions twice.  (Resp't Br. at 9 (citing Trial Tr. at 185).)

Both arguments have merit. Accordingly, the Court REMANDS the matter to the Department with instructions to apply the appropriate negative adjustments to the subject transactions at issue here within the statistical sample.[10] The Court notes that once the Department makes all the necessary adjustments to its statistical sample as required by this opinion, the Department shall recompute Miller Pipeline's overall tax liability/refund opportunity for the years at issue in light of the adjusted statistical sample. Any refund due Miller Pipeline at that point shall be reduced by the amount of the refunds on these transactions for which Miller Pipeline already received credit. (See Pet'r Trial Ex. 1 at 66, 71, 75-77.) (See also Pet'r Br. at 20-22 (conceding the same).)

VIII.

In May of 2007, Miller Pipeline received a $2,000 invoice from Hession Farms, Inc. for "field tile replacement [at] Lauth property on 56th Street." (Pet'r Trial Ex. 21 at 3.) (See also Trial Tr. at 60 (explaining that Miller Pipeline "damaged field – drainage tile in a field and [] contracted Hession Farms to come out and fix that tile").) The invoice reflects that $500 of the $2,000 charge was attributable to materials while the other $1,500 was attributable to installation. (Pet'r Trial Ex. 21 at 3.) Miller Pipeline did not remit any sales tax on this transaction at its point of purchase. (See Pet'r Trial Ex. 21 at 1, 3.) The Department subsequently found that Miller Pipeline owed tax on the materials portion of this transaction. (See Pet'r Trial Ex. 1 at 76 (indicating a positive adjustment of $500 for the transaction within the statistical sample).)

---

[10] The adjustments should be negative because the Department already determined that: a) Miller Pipeline paid some tax on the subject transactions but b) that Miller Pipeline was not required to do so. (Compare Pet'r Trial Exs. 14-17, 19-20 (invoices of the subject transactions) with Pet'r Trial Ex.1 at 32, 35, 43-44 (indicating that the Department determined that Miller Pipeline was entitled to a refund on these transactions).) (See also Trial Tr. at 105, 154-55, 182 (explaining that within the context of the statistical sample, a negative adjustment was to be awarded if Miller Pipeline remitted tax on a transaction and was not required to).)

18

On appeal, Miller Pipeline claims that it should not have been required to remit tax on this transaction (and is thus entitled to a refund of the tax it did pay) because Hession Farms owed the tax. (See Pet'r Br. at 23.) More specifically, Miller Pipeline states that under 45 Indiana Administrative Code 2.2-4-22(e), Hession Farms owed the tax because its contract with Miller Pipeline was a "lump-sum" contract. (See Pet'r Br. at 23.)

The regulation to which Miller Pipeline cites states that

> [w]ith respect to construction material a contractor acquired tax-free, the contractor is liable for the use tax and must remit such tax (measured on the purchase price) to the [Department] when he disposes of such property in the following manner:
>
> *****
>
> [] Lump sum contract. He converts the construction material into realty on land he does not own pursuant to a contract that includes all elements of cost in the total contract price.

45 IND. ADMIN. CODE 2.2-4-22(e)(3) (2006) (see http://www.in.gov/legislative.iac/). Here, however, Miller Pipeline has provided no explanation as to what field tile is and whether, in repairing it, Hession Farms converted it from personal property into real property. Moreover, Miller Pipeline has not provided any evidence demonstrating that the contract was lump-sum; rather, that was merely a statement made by Miller Pipeline's attorney. (Compare Trial Tr. at 59-61 with Pet'r Br. at 23.) Accordingly, the Court AFFIRMS the Department's treatment of this transaction within its statistical sample.

IX.

On January 16, 2006, Miller Pipeline received a $3,500 invoice from Lindenschmidt, Inc. that included a $280.00 charge for ten "OSHA Standard" books. (Pet'r Trial Ex. 23 at 5.) On October 26, 2006, Miller Pipeline received a $64,534.55 invoice from FMI Corporation that included a $2,787.37 charge for "Materials/Printing/[and ]Shipping[.]"

19

(Pet'r Trial Ex. 22 at 3.) On November 14, 2006, Miller Pipeline received a $3,804.17 invoice from Dawghaus Photography that included a $496.75 charge for "Downloads & Conversions," "Media & Archive," and "Shipping." (See Pet'r Trial Ex. 24 at 3.) None of these three invoices charged any sales tax. (See Pet'r Trial Exs. 22 at 3, 23 at 5, 24 at 3.)

The Department subsequently imposed tax on the above-described portions of these three transactions. (See Pet'r Trial Ex. 1 at 75 (posting a positive adjustment of $496.75 for the Dawghaus transaction within the statistical sample), 76 (posting a positive adjustment of $280.00 for the Lindenschmidt transaction within the statistical sample), 85 (posting a positive adjustment of $2,787.37 on the FMI transaction within the statistical sample).) Miller Pipeline claims that the Department erred in doing so because all three vendors are primarily engaged in the provision of services and their charges for materials are inconsequential to the overall amounts of their invoices. (See Pet'r Br. at 23-26.) As support for its claim, Miller Pipeline refers the Court to 45 Indiana Administrative Code 2.2-4-2(a), which states:

> Professional services, personal services, and services in respect to property not owned by the person rendering such services are not "transactions of a retail merchant constituting selling at retail", and are not subject to [sales] tax. Where, in conjunction with rendering professional services, personal services, or other services, the serviceman also transfers tangible personal property for a consideration, this will constitute a transaction of a retail merchant constituting selling at retail unless:
>
> (1) The serviceman is in an occupation which primarily furnishes and sells services, as distinguished from tangible personal property;
> (2) The tangible personal property purchased is used or consumed as a necessary incident to the service;
> (3) The price charged for tangible personal property is inconsequential (not to exceed 10%) compared with the service charge; and

20

> (4) The serviceman pays [sales] tax or use tax upon the tangible
> personal property at the time of acquisition.

45 IND. ADMIN. CODE 2.2-4-2(a) (2006) (see http://www.in.gov/legislative.iac/).

While Miller Pipeline's brief states that Lindenschmidt, Dawghaus, and FMI are all "primarily engaged" in providing services, Miller Pipeline did not present any evidence at trial that would support such a conclusion.[11] (See Trial Tr. at 63-67 (indicating merely what FMI, Lindenschmidt, and Dawghaus were hired to do for Miller Pipeline).) Consequently, the Court must AFFIRM the Department's treatment of these transactions within its statistical sample.

## X.

During trial, Miller Pipeline presented five invoices from USIS Commercial Services, Inc., one invoice from McGraw-Hill, one invoice from Dun & Bradstreet, and one invoice from Datafax, Inc. (Pet'r Trial Exs. 25-32.) In its statistical sample, the Department determined that the underlying transactions for all eight of these invoices were taxable. (See Pet'r Trial Ex. 1 at 76-77, 80 (posting positive adjustments for each and listing the reason for taxability as "[e]lectronic database subscriptions").)

On appeal, Miller Pipeline challenges the Department's treatment of these eight transactions using the same basis it advanced to challenge the taxability of the transactions discussed in Issue IX: the vendors are "primarily engaged" in providing services under 45 I.A.C. 2.2-4-2(a). (Compare Pet'r Br. at 23-26 with 26-30.) As with the vendors addressed in Issue IX, however, Miller Pipeline did not present any evidence at

---

[11] The Court notes that underneath FMI's logo on its invoice to Miller Pipeline are the words "Management Consultants to the Construction Industry." (See Pet'r Trial Ex. 22 at 3.) Moreover, the invoice from Lindenschmidt provides "d/b/a Risk Management Services[.]" (See Pet'r Trial Ex. 23 at 5.) While the Court can infer from these statements that FMI and Lindenschmidt do provide a service, those statements are not enough to conclude that either "primarily furnishes and sells services[.]" 45 I.A.C. 2.2-4-2(a)(1) (emphasis added).

21

trial that demonstrated the occupation in which each of these vendors was "primarily engaged." (See Trial Tr. at 67-75 (indicating merely what USIS, McGraw-Hill, Dun & Bradstreet, and Datafax provided in exchange for Miller Pipeline's payment).) Consequently, the Court must also AFFIRM the Department's treatment of these transactions within the statistical sample.[12]

XI.

In February of 2006, Miller Pipeline received a $963.87 invoice from Quality Supply & Tool Company. (Pet'r Trial Ex. 33 at 29.) The invoice reflects that this charge was comprised of the following: $794.36 was attributable to the purchase of various tools and supplies; $15.89 was attributable to "miscellaneous charges"; $48.42 was attributable to the sales tax on these purchases; and $105.00 was attributable to a non-taxable freight charge. (Pet'r Trial Ex. 33 at 29.) The Department subsequently found, however, that Miller Pipeline owed tax on the freight charge. (See Pet'r Trial Ex. 1 at 72 (posting a positive adjustment of $105.00 for the transaction within the statistical sample).)

On appeal, Miller Pipeline claims that it should not have been required to remit tax on the freight charge (and is thus entitled to a refund of the tax it did pay) because it did not take possession of the tools and supplies in Indiana: Quality Supply shipped them directly to Miller Pipeline's job site in Cresaptown, Maryland. (Pet'r Br. at 31 (citing 45 IND. ADMIN. CODE 2.2-4-1(2006) (see http://www.in.gov/legislative.iac/); IND. CODE § 26-1-2-401 (2006)).) (See also Trial Tr. at 76-77.) The Department responds, however, that "Miller

---

[12] The Court notes that with respect to Issues IX and X, Miller Pipeline's brief also states no fewer than seven times that 45 I.A.C. 2.2-4-2 is "questionable because it creates a presumption that all unitary transfers of property and services for consideration are retail transactions . . . [and] impermissibly places the burden on the taxpayer to prove non-taxability." (See Pet'r Br. at 24-26, 28-30.) This argument warrants no attention from the Court. See, e.g., Crystal Flash Petroleum, LLC v. Indiana Dep't of State Revenue, 45 N.E.3d 882, 886 n.7 (Ind. Tax Ct. 2015) (indicating that the Court will not resolve an issue when its proponent fails to provide sufficient legal analysis).

Pipeline <u>presumes</u> that it did not take possession of the shipped goods in Indiana." (Resp't Br. at 14 (emphasis added).)  It asserts that "the only evidence [Miller Pipeline] presented regarding this transaction was the invoice itself, which [merely] shows that the vendor was located in Indianapolis." (Resp't Br. at 14.)  The Department is incorrect.

The invoice also indicates that the items purchased by Miller Pipeline were to be shipped to "Miller Pipeline, c/o Holshot Motor Sports, 14710 McMullin Hwy., Cresaptown, MD 21502" via "UPS 2nd Day Blue." (Pet'r Trial Ex. 33 at 29.)  (<u>See</u> <u>also</u> Trial Tr. at 76 (explaining that Miller Pipeline maintained a job site in Cresaptown, Maryland).)  This invoice statement is sufficient to support the conclusion that Miller Pipeline did not take possession of the shipped goods in Indiana.  Consequently, the burden shifted to the Department to present evidence that would rebut that conclusion.  <u>See</u> <u>Longmire</u>, 638 N.E.2d at 898.  As the trial transcript indicates, however, the Department provided no rebuttal evidence.  (<u>See,</u> <u>e.g.</u>, Trial Tr. at 87-97 (providing the Department's cross-examination of Miller Pipeline's controller).)  Thus, the Court finds that the Department failed to rebut Miller Pipeline's evidence with respect to this issue.

Miller Pipeline has demonstrated that it erroneously paid tax on Quality Supply's $105.00 freight charge.  Accordingly, the Department's Proposed Assessments as they relate to this issue are REVERSED.  The Court REMANDS the matter to the Department with instructions to make the appropriate negative adjustment to the statistical sample to account for that erroneous tax payment.  (<u>Compare</u> Pet'r Trial Ex. 1 at 72 <u>with</u> Trial Tr. at 105-07, 117-18.)

**CONCLUSION**

Miller Pipeline has rebutted the presumption of validity afforded to the Department's Proposed Assessments as they relate to the treatment of the transactions discussed in Issues I, II, III, IV, VII, and XI of this opinion. Accordingly, the Department's audit findings with respect to these transactions are REVERSED.

Miller Pipeline has not, however, rebutted the presumption of validity afforded to the Department's Proposed Assessments as they relate to treatment of the transactions discussed in Issues V, VI, VIII, IX, and X of this opinion. Accordingly, the Department's audit findings with respect to these transactions are AFFIRMED.

The Court REMANDS this matter to the Department with instructions to make the adjustments to its statistical sample consistent with this opinion. Once the Department has made those adjustments, it shall reconcile Miller Pipeline's overall tax liability/refund opportunity in accordance with the recomputed statistical sample, reducing that amount by the credits already received and discussed in Issue VII.